[Crim. No. 15113. In Bank. Mar. 1, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
HARRY EDGAR HUNT, Defendant and Appellant.

**COUNSEL**

Harry Edgar Hunt, in pro. per., R. Jay Engel, under appointment by the Supreme Court, and John R. Sheehan, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, William H. Waysman and Jimmie E. Tinsley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PETERS, J.**—A jury found Harry Edgar Hunt guilty of one count of unlawful possession for sale of a restricted dangerous drug, methedrine, and not guilty of unlawful possession of restricted dangerous drugs, Nembutal and amphetamine. (Health & Saf. Code, §§ 11911, 11910.) He appeals from the ensuing judgment.[1]

On February 7, 1968, Officer Clifford W. Owens and several other officers went to the apartment of Alan Hall. Upon entering the bedroom of the apartment, Officer Owens saw Hall and defendant. Defendant was seated on a chair with a hypodermic needle in his right arm. The officer removed the needle and a 3-cc. syringe, which contained 2 ccs. of methedrine. At his feet was an open blue and white travel case. In the travel case were four 30-cc. vials, a little plastic box with four capsules and three

---

[1]No prior convictions were charged or found.

tablets, some needles, and four envelopes with disposable syringes. One of the vials was not full.

The four vials contained methedrine, the yellow capsules contained pentobarbital, and the tablets contained amphetamine.

The four vials were labelled with pharmacy labels. Each had a prescription number, defendant's name, and the physician's name, Dr. Smith. One vial was dated January 16, 1968, another January 30, 1968, and two January 20, 1968. It was stipulated that defendant had had prescriptions filled for four vials of methedrine since January 20.

When the officer entered the bedroom, Hall was seated in a chair near a bed. He appeared to be under the influence of a dangerous drug. He had a notebook in his left hand and a pen in his right. On a bed in front of him, there was a brown leather suitcase, which was about two feet from him. The suitcase was open. It contained some men's clothing, balls of cotton, two Bayer aspirins, some syringes and needles, four vials of methedrine, one vial of amphetamine, a portion of a prescription label with Hall's name on it, pentobarbital and secobarbital capsules, and amphetamine tablets.[2] Only one of the vials had a drug store label on it. The officer subsequently found seven pharmacy labels in Hall's wallet. Six dollars were lying on the bed between Hall and the suitcase.[3]

The notebook held by Hall had a number of entries in it such as "2-5-68, pay $20 for deal on two vials of meth," with the number "9008." None of the entries stated that anything was sold.

Officer Owens had extensive training, education, and experience relating to the possession of and trafficking in dangerous drugs. He said that users of methedrine use up to 8 ccs. a day. He said that, although there were numerous variations in individual transactions, the going price for the illegal sale of methedrine was about $30 for a 30-cc. vial and $6.00 for a "fix" of 2 ccs. The price for methedrine at a pharmacy pursuant to a perscription was much lower. He also said that the entries in the notebook reflected transactions in dangerous drugs.

Officer Owens testified that based upon his experience it was his opinion

[2]It was stipulated that in January 1968, Hall had purchased pursuant to prescription 360 ccs. of methedrine, that on February 2, he had purchased 120 ccs., and that on February 5 an additional 60. All of the methedrine was purchased pursuant to prescription, and apparently all was packaged in 30-cc. vials.

[3]Hall was tried with defendant. He also was convicted on a charge of possession for sale of methedrine. He, like defendant, was acquitted of the charge of unlawful possession of the other drugs. Apparently the basis of the acquittals was the prescriptions that Hall and defendant had for all of the drugs.

that the methedrine found in the blue and white travel case and in the brown suitcase was possessed for sale. He said that his opinion was due "to the quantity involved, the over-all street value, the normal use by an individual."

Dr. Smith, who had been practicing in Los Angeles since 1918, prescribed methedrine for his patients on a number of occasions, usually prescribing 1 cc. in the morning and one in the evening. He did not recall ever prescribing more than that. He would prescribe two 30-cc. vials and often allowed for refills of prescriptions. He identified seven prescriptions for Hall and two for defendant and said he occasionally phoned prescriptions to the pharmacy.

Defendant's testimony may be summarized as follows: He was 35 years old and had been using methedrine since 1965. He had never purchased methedrine illegally but purchased it at a drug store upon prescription. He had never sold methedrine to anyone and had no intent to sell to defendant Hall or anyone else. He was using about 9 ccs. of methedrine a day, three in the morning, at noon, and in the evening. He estimated the four vials in his case as about a week's supply. He needed the drug for lethargy, a type of narcosis. He had met Hall at Dr. Smith's office, and while waiting for the doctor, they had discussed music. Hall had invited him to the apartment to see a stereo complex, and at the time of his arrest he had been there about an hour listening to music. When the officers entered he was injecting himself with methedrine. He was living at a motel, and when away from the motel he carried the drugs in the trunk of his automobile because he was aware that they were dangerous drugs and he wanted to maintain control over them and because he often worked long hours and took the medicine while working. His job was constructing booths and setting up exhibits for shows, and he sometimes worked as much as 24 consecutive hours.

Section 11911 of the Health and Safety Code provided in 1968: "Except as otherwise provided in Article 8 (commencing with Section 4210), Chapter 9, Division 2 of the Business and Professions Code, every person who possesses for sale any restricted dangerous drug shall be punished by imprisonment in the state prison for not less than one year . . . ." This section dealing with possession for sale of restricted drugs, unlike the immediately preceding one relating to possession of such drugs, does not contain an exception for drugs possessed upon a prescription. Section 11912 of the Health and Safety Code dealing with sale, furnishing, manufacturing, or transporting of restricted dangerous drugs also contains an exception for prescriptions.

The omission of any exception for drugs obtained by prescription

in section 11911 must be understood as meaning that a person may be convicted under the section who has obtained a drug by prescription but possesses the drug for sale to another without prescription. (Cf. *People* v. *Kessler,* 250 Cal.App.2d 642, 645 [58 Cal.Rptr. 766].)

■ The elements of a violation of section 11911 of the Health and Safety Code are possession of the dangerous drug for the purpose of selling it. (*People* v. *Allen,* 254 Cal.App.2d 597, 600-601 [62 Cal.Rptr. 235].) ■ In determining sufficiency of evidence under section 11911, precedents relating to possession for sale of narcotics are relevant. (*People* v. *Allen, supra,* 254 Cal.App.2d 597, 600-601.) ■ To establish unlawful possession, it must be shown that the accused exercised dominion and control over the drug. (*People* v. *Redrick,* 55 Cal.2d 282, 285 [10 Cal. Rptr. 823, 359 P.2d 255].)

■ Possession of dangerous drugs may be found to be joint in appropriate circumstances (cf. *Rideout* v. *Superior Court,* 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197]), and, although the fact of access by several persons is a matter to be considered, no sharp line can be drawn to distinguish the congeries of facts which will and will not permit a finding of joint or constructive possession based on access. ■ Proof of access to the place where the drugs are found, without more, is not sufficient to support a finding of unlawful possession. (Cf. *People* v. *Harrington,* 2 Cal.3d 991, 998 [88 Cal.Rptr. 161, 471 P.2d 961]; *People* v. *Redrick, supra,* 55 Cal.2d 282, 285-288.)

Although the evidence is clear that defendant had possession of the methedrine in the blue and white travel case at his feet, there is no substantial evidence to show that he had joint or constructive possession of the drugs found in the brown suitcase near Hall. All of the circumstances in the instant case indicate that the drugs in the brown suitcase near Hall were in his possession and not defendant's.

The brown suitcase was near Hall. Nothing in the brown suitcase had defendant's name upon it. One of the vials of methedrine and a prescription label in the brown suitcase had Hall's name on it. At the time of arrest, Hall, according to the officer, appeared to be under the influence of a drug like methedrine. Hall had in his hand a book which recited certain drug transactions. During the five weeks preceding arrest Hall had purchased 540 ccs. of methedrine.

On the other hand, all of the methedrine found at defendant's feet was labelled in his name, and other things found there had his name on them. Nothing in the travelling case had Hall's name on it. There is no evidence that defendant and Hall were in business together, and defendant did not

live in the apartment. In these circumstances, the only fair inference is that the matters in the brown suitcase belonged to Hall alone and the articles in the blue and white travelling case belonged to defendant alone.

At oral argument the deputy attorney general stated that he did not rely on the theory that defendant was in joint possession of the brown suitcase and stated he was relying on the officer's opinion that the methedrine found in the travel case, at the feet of defendant, was possessed for sale.

The conviction of defendant cannot be upheld on the theory that defendant's conceded possession of the methedrine in the travel case and in the syringe he was using was a possession for sale. Although the officer testified that in his opinion the methedrine was possessed for sale, his testimony in the circumstances of this case may not be held to be substantial evidence to support the conviction.

In *People* v. *Bassett,* 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777], Justice Mosk, speaking for a unanimous court, stated: " 'The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion . . . it does not lie in his mere expression of conclusion.' (Italics added.) (*Carter* v. *United States* (1957) 252 F.2d 608, 617 [102 App.D.C. 227].) In short, 'Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the *facts* and the validity of the *reasons* advanced for the conclusions' (Italics added.) (*People* v. *Martin* (1948) 87 Cal. App.2d 581, 584 [197 P.2d 379]; accord, *People* v. *Jones* (1964) 225 Cal. App.2d 598, 611 [37 Cal.Rptr. 454].)"

In cases involving possession of marijuana and heroin, it is settled that an officer with experience in the narcotics field may give his opinion that the narcotics are held for purposes of sale based upon matters such as quantity, packaging, and the normal use of an individual. On the basis of such testimony convictions of possession for purposes of sale have been upheld. (*People* v. *Martin,* 247 Cal.App.2d 416, 420-421 [55 Cal.Rptr. 629]; *People* v. *Aguilar,* 232 Cal.App.2d 173, 178 [42 Cal.Rptr. 666].)

A different situation is presented where an officer testifies that in his opinion a drug, which can and has been lawfully purchased by prescription, is being held unlawfully for purposes of sale. In the heroin and marijuana situations, the officer experienced in the narcotics field is experienced with the habits of both those who possess for their own use and those who possess for sale because both groups are engaged in unlawful conduct. As to drugs, which may be purchased by prescription, the officer may have experience with regard to unlawful sales but there is no reason to believe that he will

have any substantial experience with the numerous citizens who lawfully purchase the drugs for their own use as medicine for illness.

In the absence of evidence of some circumstances not to be expected in connection with a patient lawfully using the drugs as medicine, an officer's opinion that possession of lawfully prescribed drugs is for purposes of sale is worthy of little or no weight and should not constitute substantial evidence sufficient to sustain the conviction. No such special circumstances were shown here as to the methedrine in the blue and white travel case.

The officer stated that his opinion that the methedrine was held for sale was based on "the quantity involved, the over-all street value, the normal use by an individual." Under his own testimony, the use by an individual could be up to 8 ccs. a day. The quantity in the blue and white travel case was less than 120 ccs. and could have been as little as a two-week supply. The street value seems immaterial. ■ The fact that medicine purchased lawfully at reasonable prices may demand a much greater price in the illegal market furnishes no reason to suppose that a possession of a two-week supply of the drug pursuant to prescription is held for profit rather than use.

Accordingly, the evidence is insufficient to sustain the judgment.

The judgment of conviction must also be reversed because the trial court refused to disclose the name of an informer upon proper demand.

Officer Owens testified that he received a note from an informant when he reported for duty at 5 p.m. on February 7, 1968. The note had been left two hours earlier. The note stated that Hall was in possession of a large quantity of methedrine in vials for sale at his apartment, that the methedrine was kept in a brown leather valise under his bed, that there was a loaded revolver in one of the bedrooms, and that the informant had witnessed dealings in narcotics by Hall. The note also stated that another person named Joe was also living at the apartment. The note did not mention defendant, Harry Edgar Hunt. Officer Owens had received information from the informer on four prior occasions, and on each occasion a person had been held to answer. None of the cases had come to trial. The officer had never received any information from the informer which was not reliable.

The officer with several additional officers went to Hall's apartment house and ascertained from the manager that Hall had been living there since January 25. They then went to Hall's apartment. Before they could knock, Joe Charles Bishop opened the door and looked out. The officers identified themselves and said they were conducting a narcotics investigation. Bishop

turned, yelled, "Al, the cops," and attempted to close the door. Upon hearing a noise from the back of the apartment the officers forced entry and found Hall and defendant in the bedroom.[4]

 When it appears from the evidence that an informer is a material witness on the issue of the defendant's guilt, the informer's identity may be helpful to the defendant and nondisclosure would deprive him of a fair trial. The People must either disclose his identity or incur a dismissal. (*Price* v. *Superior Court,* 1 Cal.3d 836, 842-843 [83 Cal.Rptr. 369, 463 P.2d 721]; *Honore* v. *Superior Court,* 70 Cal.2d 162, 167 [74 Cal.Rptr. 233, 449 P.2d 169]; *People* v. *McShann,* 50 Cal.2d 802, 808 [330 P.2d 33].)

We pointed out in *Price:* "The defendant need not prove that the informer would give testimony favorable to the defense . . . nor need he prove that the informer was a participant in or even an eyewitness to the crime. The defendant's 'burden extends only to a showing that "in view of the evidence, the informer would be a material witness on the issue of guilt and nondisclosure of his identity would deprive the defendant of a fair trial." (*People* v. *Williams* (1958) 51 Cal.2d 355, 359 [333 P.2d 19].) "That burden is discharged, however, when defendant demonstrates a reasonable possibility that the anonymous informant whose identity is sought could give evidence on the issue of guilt which might result in defendant's exoneration. . . ." ' [¶] ' "[B]y the very nature of the problem here confronting defendants it is impossible for them to state *facts* which would show the materiality of the informant's testimony. Since they do not know his identity they cannot possibly state factually what he will say if he is required to testify." ' " (*Price* v. *Superior Court, supra,* 1 Cal.3d 836, 843.)

In *People* v. *Garcia,* 67 Cal.2d 830 [64 Cal.Rptr. 110, 434 P.2d 366], police officers obtained a search warrant for the search of an apartment in which Frank and Rose Reyna and Joe Gomez resided. The warrant was issued on the basis in part of information received from two unidentified informants that the three named persons were selling heroin and marijuana at the apartment and that the two informants had made purchases from the two named males. When the officers executed the warrant and entered the apartment, they found the defendant and one Mary Velasquez lying on a mattress in the dining room. The Reynas were found in a bathroom, and Gomez in the dining room. Heroin and marijuana were found under the mattress upon which defendant had been lying. *Neither the search warrant nor the affidavit*

---

[4]All of the evidence in the last two paragraphs was admitted at the preliminary hearing but not at the trial of the issue of guilt.

*had made any mention of defendant.* There was evidence that defendant made admissions of ownership. Defendant was charged and found guilty of possession of heroin for sale and possession of marijuana for sale. Defendant claimed that he was a heroin addict, had come to the apartment for a "fix," and had never lived at the apartment. He denied making the admissions of ownership of the narcotics.

It was held that the trial court erred in refusing to compel disclosure or dismissal because the informant was a material witness. We reasoned: "Certainly if testimony were produced to the effect that Gomez and the Reynas were the only residents of the apartment during the indicated period of time, and that such residents kept heroin stored in balloons under the mattress where the narcotics were in fact found, such evidence would be highly relevant and material to defendant's contention that he was merely a visitor at the apartment who had come to get a 'fix.' " (67 Cal.2d at p. 839.)

It seems apparent that the showing made in the instant case presents a stronger case for disclosure than *People* v. *Garcia, supra,* 67 Cal.2d 830. In *Garcia,* the officer's information was at least a day old; here about two hours. In *Garcia* the informers merely stated that the suspects were selling narcotics from their apartment and did not locate or state that any narcotics were in the apartment; here the informer places the methedrine belonging to codefendant Hall as being in a brown valise, in which it was in fact found.

Most important of all, in the instant case the information given to the officer by the unidentified informer itself tends to exonerate defendant. If the informer testified, as he wrote to the officer, that Hall was the owner of the brown valise and owned the methedrine therein, his testimony would tend to exonerate defendant with respect to the claim of constructive ownership.

In the instant case, we know that the informer had information bearing on the issue of guilt; whereas in *Garcia* we could only speculate that he had such information. The dissent by Justice Mosk in *Garcia* was based on the theory that there was no showing that the informers (who were purchasers and had not claimed knowledge of narcotics other than those purchased) had information on the issue of guilt. Even under the dissenting view in

*Garcia,* it seems that disclosure was required or the instant case must be dismissed.

At any rate the judgment is reversed for reasons already stated.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.