[Crim. No. 10116. First Dist., Div. Four. Aug. 4, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
LEONARDO PACHECO, JR., Defendant and Appellant.

## COUNSEL

Leonardo Pacheco, Jr., in pro. per., Richard L. Phillips, under appointment by the Court of Appeal, and Davidson, Davidson & Phillips for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Joyce F. Nedde and Eugene Kaster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BRAY, J.**\*—Defendant appeals from conviction after jury trial in the Superior Court of Alameda County of violation of section 11530, and two counts of violation of section 11910, Health and Safety Code.

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

## Questions Presented

1. Did the officers comply with the "knock and notice" requirements of Penal Code section 1531?

2. Should the identity of the informer have been disclosed?

3. Did the *in camera* hearing (Evid. Code, § 1042, subd. (d)) deprive defendant of his Sixth Amendment right to compulsory process?

4. Did the conduct of the prosecuting attorney constitute prejudicial misconduct?

## Record

The District Attorney of Alameda County filed an information charging defendant, in count one, with violation of Health and Safety Code section 11530 (possession of marijuana), in count two, with violation of Health and Safety Code section 11910 (possession of barbiturates), and in count three, violation of Health and Safety Code section 11910 (possession of methamphetamine). Defendant made a motion under Penal Code section 1538.5 to suppress evidence. It was granted only as to property not described in the search warrant which was issued in this matter. After a trial the jury found defendant guilty on all three counts and judgment was entered accordingly. The court, after striking from the record two prior convictions admitted by defendant, sentenced defendant to state prison for the terms prescribed by law, the sentences to run concurrently.[1]

## Facts

On January 15, 1971 Robert Elsberg, an agent of the California Bureau of Narcotic Enforcement, obtained a search warrant for the search of Apartment C, 1645 47th Avenue, Oakland, and with other officers went to that location. The search warrant and the circumstances of entry to the building will be discussed later.

In a bedroom to which defendant retreated on entry of the officers, Elsberg found defendant standing near a plastic bag from which red seconal pills were spilling onto the floor. Also in that room, Elsberg found three bindles of methamphetamine, some marijuana on a bookstand, and some barbiturates in an attache case beneath the bed. After defendant was arrested and given the *Miranda* warnings and the officers were getting

---

[1]At one time this case was consolidated with another criminal charge against defendant. However, after the court granted a 1538.5 motion in that case, it was severed from the present action.

names and birth dates of other people in the apartment, defendant stated: "That's all right, you don't have to arrest these people, all this stuff is mine." He also stated that a decorative clock on the living room table belonged to him. Before leaving for jail, defendant dressed himself in a shirt which he took from a clothes hanger in the bedroom closet. Two witnesses, John Marzan and Catherine Kaufmann, who also lived in Apartment C, testified that defendant also lived there and was considered the head of the household. They also testified that defendant sold drugs there and the seconal belonged to defendant, the methamphetamine to defendant, Perkins and Megaloff, and that Perkins, who, defendant testified, was the renter of the apartment, had not lived there during the preceding month. Marzan testified that the attache case containing the pills belonged to defendant, and that he had heard defendant state to the officers that all the "stuff" belonged to him.

Perkins testified that Apartment C was rented to him, that defendant paid no part of the rent, and that the utilities were registered in Perkins' name. Perkins had voluntarily committed himself to the California Rehabilitation Center for narcotic addicts. Invoking the privilege against self-incrimination, he declined to answer whether the contraband found in Apartment C belonged to him. He testified that he slept in his own house for the month preceding the raid, and that defendant had only stayed in Apartment C on the night before.

Defendant testified that he did not reside in Apartment C, and did not know that it contained contraband. He had visited Apartment C three or four times and had become acquainted with Perkins who rented the apartment. The day before the arrest, he visited Apartment C and asked Perkins if he could stay and store some of his possessions there in the apartment. Defendant, his girlfriend and Marzan remained there overnight and were there at the time of the arrest. The property which defendant brought to store included six or seven used tape recorders which he had forgotten to give his nephews and nieces during the Christmas holidays. When he told the officers that all the "stuff" belonged to him, he was referring to the tapes and stereo equipment and not to the drugs. Defendant knew that Perkins was a drug user. When asked how the "reds" got on the floor, he stated that he must have knocked them from their hiding place and "knocked them all over the place."

1. *Compliance with Penal Code section 1531.*

Penal Code section 1531 provides that in executing a search warrant, "The officer may break open any outer or inner door or window of

a house, or any part of a house or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance."

■ An entry of a house, in violation of the aforementioned section, renders any following search and seizure unreasonable within the purview of the Fourth Amendment. (*Greven* v. *Superior Court* (1969) 71 Cal.2d 287, 290 [78 Cal.Rptr. 504, 455 P.2d 432]; *People* v. *Garber* (1969) 275 Cal.App.2d 119, 131 [80 Cal.Rptr. 214].) In order to substantially comply with the dictates of section 1531, the police officer must (1) knock or employ some other means reasonably calculated to notify the occupants of his presence, (2) identify himself as a peace officer, and (3) explain the purpose of his demand for admittance. (*People* v. *Perales* (1970) 4 Cal. App.3d 773, 778 [84 Cal.Rptr. 604]; *Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 319 [82 Cal.Rptr. 348, 461 P.2d 628].) ■ "[W]hen there is reasonable cause to make an arrest and search and the facts known to [the officer] before his entry are not inconsistent with a good faith belief on the part of the officer that compliance . . . is excused, his failure to comply with the formal requirements of that section does not justify the exclusion of the evidence he obtains." (*People* v. *Guthaus* (1962) 208 Cal.App.2d 785, 790-791 [25 Cal.Rptr. 735], quoting *People* v. *Maddox* (1956) 46 Cal.2d 301, 306-307 [294 P.2d 6].) The facts concerning the officers' appearance at Apartment C follow.

■ Elsberg's affidavit in support of the warrant stated that, on January 14, 1971, Elsberg was contacted by informant "X" who told Elsberg that, on January 14, 1971, X had observed a box lid containing approximately one-fourth pound of marijuana on the coffee table in the living room of Apartment C. X had also observed four kilo packages of marijuana in an attache case in the bedroom. X referred to Apartment C as defendant's residence. On other occasions, X had given Elsberg information which had led to the arrest of at least 50 persons and the conviction of at least 10 persons, that none of the information received from X by Elsberg had ever proved unreliable, and that X's name was not disclosed for fear of X's personal safety and because revelation of X's name would hinder further narcotic investigations in the City of Oakland.

At approximately 4:30 p.m., on January 15, 1971, Elsberg, in the company of two uniformed policemen, three plainclothes policemen and two other plainclothes State Bureau of Narcotic Enforcement agents, went with a search warrant to Apartment C. Elsberg was carrying the search warrant in one hand and his badge in the other. As Elsberg entered the yard in front of Apartment C, Mosquedo came out of the apartment. Elsberg gave the warrant to Officer O'Guinn, one of the plainclothes policemen, and attempted to detain Mosquedo. Mosquedo testified that he saw Elsberg's

badge but did not obey Elsberg's order to stop and was detained only after a struggle.

While Elsberg was involved with Mosquedo, O'Guinn approached the front door of the apartment. The front door was constructed primarily of transparent glass, and to its right there was a curtained glass window through which O'Guinn testified he had clear visibility.

Agent Picallo, who was directly in front of O'Guinn, knocked on the door and stated: "Police officers. We have a search warrant. Open the door." O'Guinn testified that he displayed his badge to defendant, who was seated on the couch in the front room. Defendant was looking in O'Guinn's direction. Thereupon defendant got off the couch and started toward the rear of the apartment. O'Guinn then instructed Picallo to "kick the door," i.e., gain entry by force. O'Guinn testified that his giving notice to defendant and the kicking in of the door occurred almost simultaneously. Picallo complied, and O'Guinn entered the front room to control another individual who had been seated on the couch.

O'Guinn testified that he ordered the door to be kicked open for fear that defendant might be attempting to destroy evidence. Defendant was brought back to the living room and was searched for weapons.

Three witnesses testified that they did not hear a knock and identification from the officers prior to the forcible entry. Agent Elsberg, who was within 5 feet of the front door, testified that while he did recall hearing police officers during this time, he did not remember any officer knocking at the door and demanding entrance. Robert Mosquedo did not hear any knock or notice, but only the sound of breaking glass. Defendant testified that he heard no announcement, but only the sound of unknown persons breaking down the door.

Defendant testified that he was not sitting on the couch when the officers arrived, but that he was standing near the bathroom door and heard someone kicking at the front door.

The record before us contains substantial evidence to support the finding, implied in the trial court's ruling, that, under *People* v. *Maddox, supra,* 46 Cal.2d 301, the police entry did not violate Penal Code section 1531. ■ "Whether the police officer had the requisite reasonable belief that technical compliance . . . was excused is a question of fact to be determined by the trier of fact under the circumstances of the particular case." (*People* v. *Perales, supra,* 4 Cal.App.3d 773, 780.) ■ Although certain witnesses testified that they did not hear a knock and identification from the officers prior to the forcible entry, the testimony of the officers which was believed by the court is substantial evidence to support the

court's finding that full compliance with section 1531 was excused, due to the officers' good faith belief that defendant was in the process of attempting to dispose of the evidence.

## 2. *Identity of the informant.*

■ Defendant moved to discover the identity of the informant, based upon the contentions (1) that the informant did not know, and did not tell the agent, what persons were present at the time the informant first went in and saw the suspected marijuana; (2) that consequently it could have been anybody and it could very well be that it was not defendant; (3) that the informant was present within a half hour before the search; and (4) defendant claimed to be a visitor rather than a resident of Apartment C. The court stated: "I think in the language of *Garcia* and *Hunt* that the defendant has made all the showing they have to make."[2]

Thereupon, at the request of the district attorney, a hearing *in camera,* pursuant to Evidence Code section 1042, subdivision (d), was held by the court (present were the judge, the informant, the deputy district attorney, and the court reporter), at the end of which the court denied the motion for discovery of the informant's identity.[3]

There has recently been a plethora of cases dealing with the showing required of a defendant who desires to obtain the identity of the informer in his case. The defendant's burden in this respect is stated in *Price* v. *Superior Court* (1970) 1 Cal.3d 836, 843 [83 Cal.Rptr. 369, 463 P.2d 721]: "The defendant need not prove that the informer would give testi-

[2] Referring to *People* v. *Garcia* (1967) 67 Cal.2d 830, 840 [64 Cal.Rptr. 110, 434 P.2d 366], and *People* v. *Hunt* (1971) 4 Cal.3d 231, 239 [93 Cal.Rptr. 197, 481 P.2d 205].

[3] Evidence Code section 1041 provides in pertinent part that a public entity has a privilege to refuse to disclose the identity of a person who has furnished information in confidence to a law enforcement officer purporting to disclose a violation of a law, if "[d]isclosure of the identity of the informer is against the public interest because there is a necessity for preserving the confidentiality of his identity that outweighs the necessity for disclosure in the interest of justice; . . ."

Section 1042, subdivision (d), provides in pertinent part that if the privilege provided for in section 1041 is claimed by a person authorized to do so, the prosecuting attorney may request that the court hold a hearing *in camera.* At such hearing, the prosecution may offer evidence disclosing the identity of the informer "to aid the court in its determination whether there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial." A reporter shall be present, the transcription shall be sealed, and only a court shall have access to its contents. "The court shall not order disclosure . . . if the party offering the witness refuses to disclose the identity of the informant, unless, based upon the evidence presented at the hearing held in the presence of the defendant and his counsel and the evidence presented at the *in camera* hearing, the court concludes that there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial."

mony favorable to the defense in order to compel disclosure of his identity, nor need he prove that the informer was a participant in or even an eye-witness to the crime. The defendant's 'burden extends only to a showing that "in view of the evidence, the informer would be a material witness on the issue of guilt and nondisclosure of his identity would deprive the defendant of a fair trial." [Citation.] . . .' "

In *People* v. *Garcia, supra,* 67 Cal.2d 830, 840, the court quoted from *People* v. *Castiel* (1957) 153 Cal.App.2d 653, 659 [315 P.2d 79]: " 'No one knows what the undisclosed informer, if produced, might testify. He might contradict or persuasively explain away the prosecution's evidence.' "

These cases are dealing with what little showing is necessary to be made by the defendant to be entitled to the identity of the informer. The showing is not as to what he would testify but as to what he might testify. In *People* v. *Hunt, supra,* 4 Cal.3d 231, 240, it is indicated that the court might "speculate" that the informer might have information of benefit to the defendant.

However, section 1042 of the Evidence Code has changed the situation. While the defendant may make out a prima facie case for disclosure, as here, the court now has a method of determining whether the nondisclosure of the identity of the informer would deprive the defendant of a fair trial, which section 1042 expressly makes the test to be applied.

In the instant case, we have before us a transcript of the proceedings at the *in camera* hearing. It clearly indicates that the knowledge the informant has could not possibly benefit defendant. On the contrary, his observations at Apartment C would fully support the testimony of the witnesses Marzan and Kaufmann to the effect that defendant resided there, sold contraband and owned that taken in the raid.

The hearing disclosed that the informant had been acting as an informer for various police agencies for the past year and a half. Elsberg testified at the trial that the informant's information had led to the arrest of at least 50 persons. The informant testified to harassment from suspects he had informed on and that he was afraid for himself and family if his identity and address became public. It does not take a lively imagination to realize that, in view of the violence found in the world of the narcotic pusher and user, disclosure might constitute a death warrant for the informer and in any event would end the informer's value as such, that in the words of section 1041 a "disclosure of the identity of the informer is against the public interest," and that "there is a necessity for preserving the confidentiality of his identity." An examination of the *in camera* transcript discloses

an additional indisputable reason why the disclosure of the identity of the informant would be of no value to defendant. Unfortunately, this reason cannot be discussed without disclosing the informant's identity. A reading of the transcript of the *in camera* hearing leaves no doubt that the informant's information could be of no help to defendant, and that the concealment of his identity could not possibly deprive defendant of a fair trial. Assuming, however, that there is a bare possibility that the informant's information could possibly benefit defendant, that benefit would be of so little value that it should not be weighed against the great harm to the public and to the informant which would result from the disclosure of the informant's identity.

If the informant's identity must be disclosed under the circumstances here, then under no circumstances could an informant's identity be withheld. This would be the end of the informer system, which has been of great help to and regarded as a necessity for law enforcement and which has existed from the very beginning of police work. The vast majority of information concerning crime received by police authorities comes from informants who would not give such information if they could not be promised concealment of their identity. There are instances in which depriving a defendant of the identity of the informer would deny the defendant a fair trial (in which event his identity should be disclosed), but this is not such an instance.

As said in *People* v. *Doran* (1972) 24 Cal.App.3d 316, 320 [100 Cal. Rptr. 886], concerning the record in the *in camera* hearing there (we have read the record), "The whole record supports the ruling of the trial court."

3. *The in camera hearing does not violate the Sixth Amendment.*

 Defendant contends that the *in camera* proceeding violated his Sixth Amendment right to compulsory process.

It should be pointed out that section 1042, subdivision (d), of the Evidence Code requires that the judge is to consider both the evidence at the open court hearing and that at the *in camera* hearing in determining whether nondisclosure of the informant's identity would deprive defendant of a fair trial.

 While as a general rule the Sixth Amendment guarantees a defendant the right to compel the attendance of witnesses chosen by him (*United States* v. *Davenport* (7th Cir. 1963) 312 F.2d 303, 305), it does not necessarily follow that a defendant has the right to compel the prosecution to disclose the name of an informer. In fact, "[i]t is the general rule, subject

to certain exceptions and limitations . . . that the prosecution is privileged to withhold from an accused disclosure of the identity of an informer." (76 A.L.R.2d 271; *Roviaro* v. *United States* (1957) 353 U.S. 53 [1 L.Ed. 2d 639, 77 S.Ct. 623]; *Scher* v. *United States* (1938) 305 U.S. 251 [83 L.Ed. 151, 59 S.Ct. 174]; *People* v. *McShann* (1958) 50 Cal.2d 802, 806-807 [330 P.2d 33].) ▉ As said in *Roviaro* v. *United States, supra,* 353 U.S. 53, 62 [1 L.Ed.2d 639, 646], "We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." (See Note, 1 L.Ed.2d 1998.)

▉ It is the invocation of the basic privilege that denies the informer's name to the defendant, not the *in camera* hearing, which is only the method by which the court determines the applicability of the privilege. If the Sixth Amendment were to apply, it would deny the privilege, the right to which has been determined to be valid.

In *People* v. *Superior Court (Biggs)* (1971) 19 Cal.App.3d 522 [97 Cal.Rptr. 118], the court was considering the *in camera* proceedings provided for in Evidence Code, section 915, subdivision (b). The court construed that section as providing "no more than a preliminary inquiry" and stated that the trial court should "continue its inquiry in an advisory setting." (*Id.* at p. 531.) In a footnote on that page the court stated: "Contrast Evidence Code section 1042, subdivision (d) [the section we are dealing with in the instant case], enacted in 1969, dealing with the parallel problem produced when the defense demands disclosure of the identity of an informer who is a material witness on the issue of guilt. Section 1042, subdivision (d), supplies more explicit procedural directions than section 915, subdivision (b), portraying the *in camera* inquiry as only one phase of a more extended, adversary hearing."

In the instant case, the safeguards which the *Biggs* court required in a section 915, subdivision (b), hearing are provided by section 1042, subdivision (d), in providing, in effect, that the *in camera* hearing is only a part of a more extended adversary hearing.

One of the objections of the reviewing court in *Biggs* to the procedure provided in section 915, subdivision (b), is that no record of the *in camera* proceedings is had "in case the defendant, on appeal from an ultimate conviction, assails an unfavorable ruling." (19 Cal.App.3d at p. 531.)

Such record is provided for in the proceeding under section 1042, subdivision (d).

In *Taglianetti* v. *United States* (1969) 394 U.S. 316 [22 L.Ed.2d 302, 89 S.Ct. 1099], an *in camera* hearing was held, apparently for the court to determine the identity of the defendant's voice in an electronic surveillance. The court held: "[W]e cannot hold that 'the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court.'" (394 U.S. at pp. 317-318 [22 L.Ed.2d at p. 305].)

### 4. *Alleged misconduct of the prosecuting officer.*

■ During the trial, in proceedings outside the presence of the jury, the district attorney stated that he was prepared to prove that defendant, while an occupant of Apartment C, was conducting substantial traffic in the same type of drugs that were the basis for the charges against him.[4] The court ruled that such proof would be limited to the 24 hours preceding the search.

Defendant's contention that the district attorney was guilty of misconduct is based upon six instances in which the district attorney apparently was attempting to elicit evidence concerning defendant's alleged dominion over the drugs prior to the 24 hours preceding the search. Some of the instances were where a witness on direct was not clear as to the period covered. In the other instances there may have been an excess of zeal on the part of the district attorney. The prosecutor's action could hardly show "a dishonest act or an attempt . . . to persuade the . . . jury by the use of deception or reprehensible methods." (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].) Defendant, while objecting to the questions and assigning misconduct, did not seek a curative instruction nor an admonition. "[I]f [the defendant] is silent or merely objects or makes the assignment of misconduct but does not request an admonition, he cannot complain on appeal [citation]." (*People* v. *Beivelman, supra,* at p. 75.) Even assuming, as contended, that the action of the district attorney was serious, the evidence of defendant's guilt was so strong that prejudice could not possibly have resulted from such action.

■ "The ultimate question which must be answered is whether the conduct of the district attorney was prejudicial, that is, after a review of the entire cause, is it reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained

---

[4]Incidentally, the testimony of the informant at the *in camera* hearing amply supports this charge—another reason why the court refused to order the informant's identity disclosed.

■■■■■■■■■

from the [conduct] attacked by the defendant." *(People* v. *Beivelman, supra,* at p. 75.)

A review of the record in the instant case demonstrates that the errors complained of did not constitute such prejudicial error as to demand reversal.

Defendant indicates that the trial court was harsh in committing him to state prison instead of the county jail, saying that it was clear to everyone in the courtroom who heard the testimony that defendant was selling drugs.

■■■■ " 'In determining the degree of an offense and the punishment to be imposed . . . it is the duty of the trial court to consider matters in aggravation as well as in mitigation of the offense. The legal significance of established facts may well constitute an element of which cognizance is taken in the exercise of judicial discretion. A hearing for the determination of the degree of an offense and the punishment therefor is not a trial in the full technical sense, and is not governed by the same strict rules of procedure as a trial. . . .' " *(People* v. *Thomas* (1951) 37 Cal.2d 74, 76-77 [230 P.2d 351].) In determining whether any facts existed to aggravate or mitigate the punishment, the court may consider many matters not admissible on the issue of guilt or innocence. *(Id.* at p. 77.) The trial court acted within its discretion and, upon a consideration of all the circumstances, fixed the sentence in accordance with the statutory authority vested in it.

Judgment affirmed.

Devine, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied August 18, 1972, and appellant's petition for a hearing by the Supreme Court was denied October 18, 1972.