[Crim. No. 31330. Second Dist., Div. Three. Apr. 24, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER HENRI BLOUIN, Defendant and Appellant.

## COUNSEL

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Jonathan B. Steiner and Russell I. Lynn, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Frederick R. Millar, Jr., and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ALLPORT, Acting P. J.—By information in case number A329292, Christopher Blouin and Lawrence Gray were charged, in count I, with grand theft of Joseph Gates' automobile in violation of Penal Code section 487, subdivision 3, and, in count II, with receiving stolen property, a 1948 Chevrolet automobile, in violation of Penal Code section 496.[1]

---

[1] The trial was severed as to Gray. He is not a party to this appeal.

In a second information in case number A333439, Blouin was charged with robbery of Mikizo Suzuki in violation of Penal Code section 211. It was further alleged in this information that Blouin used a pistol in commission of the crime within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1).

Blouin pled not guilty and filed written motions to compel disclosure of the identity and address of the untested police informant and to suppress evidence of his statements to the police in accordance with Evidence Code section 402. Both motions were heard and denied. Following a court trial Blouin was found not guilty of grand theft but guilty of receiving stolen property in case number A329292 and thereafter withdrew his plea of not guilty, pled guilty to robbery and admitted the use allegations in case number 333439. The two cases were consolidated for all further proceedings, the use allegations found to be true and the robbery to be in the first degree. Defendant was sentenced to state prison with sentences to run concurrently with time in custody fixed at 60 days. He appeals from the judgment.

## Contentions

It is contended on appeal that (1) the denial of the suppression motion was error, (2) the denial of the disclosure motion was error, and (3) that sentencing irregularities be corrected by this court or the cause remanded for resentencing.

Since no claim is made of insufficiency of the evidence no plenary statement of the facts is necessary in this opinion. We shall refer only to those portions of the record deemed necessary to a resolution of these issues.

## Facts[2]

With respect to the suppression and disclosure motions, apparently prompted by the preliminary hearing testimony of investigating police officer Gilbert Hetrick, a pretrial hearing under Penal Code section 1538.5 and Evidence Code section 402 was held to determine the admissibility of statements made by defendant to Hetrick in the course

---

[2]The order denying suppression is reviewable on appeal from the judgment and is governed by the rules of appellate review applicable to such appeals. (Pen. Code, § 1538.5; *People* v. *Jasso,* 2 Cal.App.3d 955, 962 [82 Cal.Rptr. 229].) The evidence is viewed in a light most favorable to the prevailing party. (See *People* v. *Midkiff,* 262 Cal.App.2d 734, 739 [68 Cal.Rptr. 866].)

of the latter's investigation of the crimes. At the hearing Officer Hetrick, assigned to investigate auto thefts, testified that in the course of his duties he obtained information about the theft of a motor vehicle belonging to Joseph Gates from a fellow officer. Contact with Gates disclosed a number of identifying characteristics of this antique vehicle. Hetrick then had a conversation with a person described only as a "confidential informant" who told him:

"that on 52nd Street between Budlong and Normandie there was a '48 Chevrolet four door, it was black primer, had a suspense receipt, a red cigarette in the front window, that it was stolen and that a person by the name of Chris owned it.

"Q. Do you recall whether the informant said it was owned by Christopher Blouin or just by Chris.

"A. Chris.

"Q. Did you speak with the informant personally?

"A. Yes.

"Q. Did the informant tell you anything else about the defendant?

"A. No.

"Q. Did he tell you anything else about the automobile?

"A. No.

"Q. Did he tell you that he had seen the automobile at that location?

"A. No."

With respect to the informant Hetrick also testified:

"Q. [by Mr. Turner for defendant] Did the informant tell you the color of the suspense sticker?

"A. I think he said it was red.

"Q. And was there in fact a red suspense sticker on the front of the car?

"A. Yes.

"Q. Did the informant tell you where Mr. Blouin lived?

"A. No, other than on 52nd Street between Budlong and Normandie.

"Q. At the time the informant gave you the information, was he under arrest?

"A. No.

"Q. Was he being detained in connection with the investigation of a crime?

"A. No.

"Q. Did he voluntarily come forward and give you this information?

"A. Yes.

"Q. To your knowledge did this informant have any motive for misrepresenting to you what the factual situation was concerning that automobile?

"A. Not that I know of.

"Q. In other words, he didn't say something to you like, 'I want to get Blouin,' or anything like that?

"A. No statements like that were made.

"MR. TURNER: I have no further questions, Your Honor.

"THE COURT: You may have cross-examination, Mr. Prukop."

CROSS-EXAMINATION

BY MR. PRUKOP: [For the People]

"Q. At the original time that you went out to this location on 52nd, did you have any information about a person by the name of Blouin?

"A. No.

"Q. Did you have any specific information as to where this person Christopher lived at all?

"A. On that street between two north-south streets there's an east-west street and it's somewhere in there.

"Q. So you were told that Christopher lived on that street or just that the car—

"A. Was there. We had gone by the location probably almost the whole week prior and never saw the car there.

"Q. But were you specifically told this person Christopher had the car and he lived on that street?

"A. I think maybe the informant did tell me that he did live on the street.

"Q. Or was your information just that the car was on that street in possession of a Christopher and that's why you went out there to check to see if you could find the car?

"A. I think the informant told me that Christopher lives on the street. The informant felt he lived on the street."

Thereafter the record reveals the following with respect to the obtaining of defendant's statements by Hetrick:

"Q. Now on the date of the defendant's arrest did you drive to the location described by the informant?

"A. Yes.

"Q. From what street did you—which street were you driving on when you first saw the automobile which is the subject of this prosecution?

"A. 52nd Street.

"Q. What direction were you driving?

"A. Westbound.

"Q. How far were you from the automobile when you first observed it?

"A. Approximately a block away.

"Q. Did you drive by the automobile?

"A. Yes.

"Q. How close did you come to the automobile when you drove by?

"A. Three feet.

"Q. Did it match the description given to you by the informant of the automobile?

"A. Yes.

"Q. What did you observe when you rode by, what did you observe concerning the automobile? Describe it, in other words.

"A. It was black or gray primer. It appeared to be a 1948, it was a four door, it had a red temporary sticker in the right front window, that's all.

"Q. I believe you indicated it was black primer; is that correct?

"A. Gray primer, black primer.

"Q. If the paint had been taken off the car would primer be on the outside of the car? Is that what you said if the paint was taken off the car?

"A. If somebody painted primer on it, you would see primer.

"Q. Before repainting the car do you always put primer on it?

"A. Sometimes.

"Q. Have you noticed in connection with cars that are stolen that often either the thief or the person that receives the stolen car will put primer on the car?

"A. Primer or a color change, usually.

"Q. Incidentally, how long have you been investigating theft of stolen automobiles?

"A. Eight years.

"Q. How long have you been a Los Angeles police officer?

"A. Eight years.

"Q. Are you assigned now to a detail that has responsibility of the investigation of reports of stolen automobiles?

"A. Yes.

"Q. How long have you been on that detail?

"A. A year and a half.

"Q. After you drove by the automobile, what did you do then?

"A. Placed the vehicle under surveillance.

"Q. Did you see the defendant near the vehicle?

"A. Yes.

"Q. Where did you see him?

"A. I saw the defendant under the hood, appeared to be working on the engine.

"The driver's door was opened and he would walk around and open the door and sit partially in the car for a brief period of time and he would get out and go back underneath the engine.

"He would go into the house, come back out, continue to be under the hood, in the car.

"Q. How long did you observe the defendant working on the car?

"A. Approximately 20 or 30 minutes.

"Q. What did you do then?

"A. Drove from the surveillance position to the vehicle itself.

"Q. Did you then alight from your police vehicle?

"A. Yes.

"Q. When you got out of the police car, had you seen anything that was inconsistent with what you or your partner had been told by the informant?

"A. No.

"Q. Was everything the informant had told you true?

"A. Yes.

"Q. Did you think it was reasonable to have relied upon the informant?

"A. I think so.

"Q. When you got out of the police car, what happened then?

"A. Approached the defendant who at that time was working on the engine.

"Q. Did you say anything to him?

"A. Displayed our police badges—displayed my police badge.

"Q. Did your partner display his police badge also?

"A. Yes.

"Q. Did either one of you say anything to the defendant?

"A. I told him I was a police officer.

"Q. Did you do all the talking?

"A. I initially approached the defendant.

"Q. Did you ask him any questions?

"A. I asked him if it was his car.

"Q. Did you ask him his name first?

"A. I believe I asked him if it was his car first.

"Q. What did he say?

"A. He said, 'Yes.'

"Q. Did you ask any other questions?

"A. I asked him what his name was.

"Q. Was that the next question you asked him?

"A. I think so. Yes.

"Q. And I take it he gave you his name; is that right?

"A. Yes.

"Q. Did you ask any other questions?

"A. I asked him if he had a registration for the vehicle.

"Q. And so when you asked him for the registration at least at that point in time you knew that there was a Chris or a Christopher Blouin who was in possession of the car described by the informant at the location described by the informant; is that correct?

"A. I determined that probably the Christopher that the informant was referring to—after the defendant told me his name was Christopher Blouin, I determined that that probably was the Christopher.

"Q. And after you asked—after he told you his name, then you asked for some registration material; is that correct?

"A. Yes.

"Q. And what did the defendant do?

"A. He went to the glove box of the vehicle and supplied me with registration material for the vehicle. . . .

"Q. The car that you observed, do you recall you testified you drove by the defendant's address and saw him working on the car? Was that car similar to the car that was taken from Mr. Gates' garage?

"A. Body style and year. Yes.

"Q. Did you think it might have been the car that was taken from Mr. Gates?

"A. Could have been.

"Q. Did you have a suspicion that it might have been the car particularly in light of what the informant had told you?

"A. It could have been Mr. Gates. Yes. It could have been another one that was taken from somebody else, too, it could have been legitimate, it could have been.

"Q. I see. When you first approached Mr. Blouin, when you got out of your car and walked up to him, was Mr. Blouin free to leave?

"A. Yes.

"Q. In other words, if he started to walk away from you you wouldn't have said anything to him?

"A. If he were to ask to go back in the house, like he had been doing while we were watching him I probably would have let him if I thought he was going to come back out and talk to me.

"Q. In·other words, he was free to leave but he had to come back?

"A. I wanted to talk to him. . . .

"Q. BY MR. TURNER: What if he had tried to walk away from you would you have tried to stop him?

"A. It would have depended—if he would have tried—if he would have just walked away from me without acknowledging my presence or anything like that I probably would have detained him. If he would have said, 'Just a minute, officer, I have put something in the oven and I would like to go in the house and get it, I'll come right back out and talk to you,' I would have let him.

"Q. But any movement away from you would be conditional upon him returning to chat with you regarding the situation; is that correct?

"A. Yes. . . .

"Q. Now I believe we finished up you had apparently asked him his name, asked him whether the car was his and asked him for some documents, as I understand you. As he produced those documents, which are the documents which were referred to as People's Exhibits 1 through 3 at the preliminary hearing, after he gave you those documents,

did you ask him any questions or did your partner ask him any questions?

"A. I believe I did while I was examining the documents.

"Q. Sorry?

"A. I believe I asked him a few questions while I was examining the documents.

"Q. And what did you ask him?

"A. I asked him—I noted that all of the registration and the paper work was in the name of Guy Richmond and I asked him why the name Guy Richmond was on all the paper work and he said, 'Well that's who I bought it from.'

"I said, 'When did you buy it,' and I don't know if he said the exact date or we agreed that the date on the paper work showed the date that he bought it and we agreed that that was April 15th and that's what the paper work showed and that's what we agreed on as a day that he bought the car.

"And I believe he said—at first he said he bought it six or eight months ago or maybe longer from Guy Richmond and then we started looking at the paper work and we kind of pinned it down as to April 15th as the day he bought it from Guy Richmond.

"Q. Did you ask him any other questions?

"A. I believe I asked him why it wasn't in his name if he owned the car.

"Q. What was his answer?

"A. I believe he stated he just hadn't got around to it or he had to get certain brake checks and light checks and things like that and he just hadn't got around to it yet.

"Q. Were any other questions asked of the defendant by either you or your partner?

"A. I think I asked him where Guy Richmond lived.

"Q. Did he give you an answer to that question?

"A. Yeah. He said it was the address that was on the paper work, I believe it was 65th Place.

"Q. Any other questions and answers?

"A. I don't think so.

"Q. What happened after you completed the questioning of the defendant?

"A. I began to examine the vehicle that was parked in the street.

"Q. And did the vehicle match the description of the automobile that was taken from Mr. Richmond—excuse me, not Mr. Richmond, the victim Mr. Gates?

"A. After careful examination we determined—we felt very strongly that this was Mr. Gates' vehicle after noting the items that Mr. Gates had told us about, and examining the vehicle that was parked there we determined that we felt very strongly that it was Mr. Gates' vehicle.

"Q. What happened then?

"A. We asked the defendant if he would go with us to Guy Richmond's house to verify that the defendant did buy the vehicle from Mr. Guy Richmond.

"Q. Did the defendant agree to do that?

"A. Yes, sir.

"Q. And then what happened?

"A. We went and got in the police vehicle and the defendant stated, 'What's wrong, what's wrong with the car?'

"Q. Now prior to the time that you answered that question had the defendant been advised of his constitutional rights as required by Miranda vs. Arizona?

"A. No.

"Q. What happened after he asked the question, 'What's wrong with this car'?

"A. I said, 'I think it's stolen, I think it's a stolen car.'

"Q. That's what you said?

"A. Either myself or my partner. We told the defendant that we thought it was a stolen car.

"Q. Now at some time later did you conduct an interrogation of questioning the defendant?

"A. No.

"Q. Did your partner conduct the questioning of the defendant?

"A. Not that I know of.

"Q. When was the defendant finally advised of his constitutional rights?

"A. I think it was right after he was placed under arrest.

"Q. And he was placed under arrest when he apparently tried to get out of the police car; is that correct?

"A. Yes, sir.

"Q. Apparently the defendant made some statements after you advised him of his constitutional rights; is that correct?

"A. Yes.

"Q. And those statements are the ones that are reflected in the reporter's transcript of the preliminary hearing; is that correct?

"A. Yes."

### Discussion

First, we once again face the familiar issue of whether the statements sought to be suppressed were elicited by the police in violation of defendant's *Miranda*[3] rights. Recognizing that not all questioning of suspects must be preceded by advice as to constitutional rights, it is suggested in this instance that (1) at the time of obtaining the statements Officer Hetrick had probable cause to arrest defendant or (2) at that time defendant was in fact in custody requiring that defendant be given the appropriate warnings prior to any questioning. As a corollary it is argued that statements elicited after the warnings were given should also be suppressed as tainted fruit of the poisonous tree. (*Wong Sun* v. *United States,* 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407]; *Brown* v. *Illinois,* 422 U.S. 590 [45 L.Ed.2d 416, 95 S.Ct. 2254].) We find no merit in the basic arguments and for that reason will not need to address the doctrine of *Wong Sun.*

■ Assuming arguendo, as contended by defendant, that the police had probable cause to arrest prior to their contacting defendant, that fact alone does not compel application of the *Miranda* principle in the instant case. It is well established that "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which

---

[3]*Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

*Miranda* by its terms was made applicable, and to which it is limited." (*Oregon* v. *Mathiason*, 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711].) True, probable cause to arrest, like arrest itself, may play a significant role in the application of the rule but, unlike the case of actual arrest, probable cause to arrest is not in all cases, synonymous with the restraint contemplated by the *Miranda* doctrine. The test is not the subjective intent of the interrogator (see *People* v. *Herdan*, 42 Cal.App.3d 300, 306 [116 Cal.Rptr. 641]), but rather whether the suspect was actually deprived of his freedom in any significant way or, as a reasonable person, was led to believe his freedom of movement was restricted by the pressures of official authority. (*Beckwith* v. *United States*, 425 U.S. 341, 347 [48 L.Ed.2d 1, 8, 96 S.Ct. 1612]; *People* v. *McLean*, 6 Cal.App.3d 300, 307 [85 Cal.Rptr. 683].) As was said in *Herdan, supra,* at pages 306-307: "When an arrest has not yet taken place, the factors considered in deciding whether custody has attached are many. Among the most important are: (1) the site of the interrogation; (2) whether the investigation has focused on the suspect; (3) whether the objective indicia of arrest are present; and (4) the length and form of questioning." (Fns. omitted.)

In the instant case no actual arrest was made until defendant tried to get out of the police car after agreeing to accompany the officers to verify his purchase of the car from Guy Richmond. While defendant was no doubt a prime suspect at all times before arrest, the testimony of Hetrick is susceptible of the interpretation that his intent to restrain was not only subjective but was limited to such detention as was necessary to facilitate the investigation. We are aware of no evidence from which defendant, as a reasonable person, could have concluded that he was "in custody" prior to the actual arrest. The interrogation was conducted on the street in front of defendant's home with no evidence of the "coercive environment" discussed in *Oregon* v. *Mathiason, supra,* 429 U.S. 492, 495. The questioning was short in duration and was not accusatory in nature. The officer's intent to detain or arrest, if such did in fact exist, had not been communicated to defendant who, up until the time he saw fit to exit the police car, was in the process of making exculpatory statements. We conclude therefore that because defendant was not under the pressures of custodial interrogation which was the concern of the court in *Miranda,* the trial court did not err in denying the motion to suppress the statements made to Hetrick before the administration of *Miranda* warnings. In view of our conclusion in this respect the fruit of the poisonous tree argument as to the statements made after the warnings were given fails and need not be further discussed.

■ Second, with respect to the contention that it was error to deny the motion to order disclosure of the informant, the record reveals the following: Prior to trial the court asked defense counsel as to his discovery. In response the following transpired:

"Mr. Turner: As to the informant, the People won't give me the name. Everything else is satisfactory.

"The Court: As to the fact on the activity of this vehicle?

"Mr. Turner: That's correct.

"The Court: What do you need it for?

"Mr. Turner: The defense in this case is one that the defendant did not steal the car nor did he have knowledge that the car had been stolen. The informant can testify that the defendant at no time acknowledged that he knew the car was stolen and the defendant indicated he didn't think the car was stolen.

"That is critical testimony on the question of knowledge which the court knows is absolutely a critical element in the charge of receiving stolen property.

"The Court: What transaction was this alleged informant present that might modify any of the transactions?

"Mr. Turner: Well, you mean in terms of the receiving or withholding of stolen property?

"Well, the information provided by the informant, and I am reading here from the vehicle report prepared by Officer Hetrick in this matter, it indicates that the informant said that Christopher Blouin was in possession of a stolen switch which means altered 1970 Fleet Master.

"Apparently, the informant was in a position to know the defendant's name, knew exactly where the car was located, and under those circumstances might very likely have information relative to what the defendant knew.

"And the test under People vs. Garcia is whether there is a reasonable possibility that the informant might present testimony which is exonerating, and I think we have met the burden in this particular case.

"The Court: Very well. Anything from the People?

"Mr. Prukop: No, Your Honor.

"The Court: Denied."

At the preliminary hearing Hetrick had testified as follows as to the informant's participation in the incident:

"Q. Now, on August 15, 1976, did you receive information regarding a defendant Blouin being in possession of a 1948 Chevrolet?

"A. Yes.

"Q. And what type of individual did you receive the information from?

"A. From an untested informant.

"Q. What?

"A. Untested informant.

"Q. For probable cause to arrest only, what was the information you received about Mr. Blouin from the untested informant?

"A. That there was a '48 Chevy four-door, black primer, and a red Suspense sticker in the front window, that it was parked on 52nd Street between Budlong and Normandie and that the person in possession of it was by the name of Chris.

"Q. Did you go to the location that the informant had given you, and this is offered for all purposes, to see if that car was there?

"A. Yes.

"Q. When did you go to that location?

"A. On the 15th.

"Q. And when you got to the 52nd Street area did you see an automobile?

"A. Yes. I am sorry.

"Q. That was the 14th?

"A. Yes, I did see an automobile.

"Q. What type of automobile did you see on 52nd Street?

"A. In front of 1301 West 52nd Street I saw a 1948 Chevrolet four-door, black primer, with a red Suspense ticket in the right front window.

"Q. What did you do when you saw that car there?

"A. Placed the vehicle under surveillance.

"Q. About what time of day on the 14th was that, approximately?

"A. The first observation was probably a quarter to 11:00 in the morning, a.m. morning hours.

"Q. Showing you these pictures the Court has marked as People's 4 collectively, can you tell the Court whether you were there when these pictures were taken?

"A. Yes, I was.

"Q. And do you recognize the car in this picture as People's 4 collectively, as being the same car?

"A. Yes.

"Q. Was that the car that is pictured in People's 4 that you saw at the address that you have given on 52nd Street in Los Angeles?

"A. Yes, parked in front of 1301 West 52nd.

"Q. During the time you were surveilling this car, what did you see happen?

"A. I observed the defendant Blouin working on the engine. The hood was up. The driver's door was open. I observed him working on the engine, go into the interior, go into the house, come back out, work on the engine, go into the inside of the car, work on the engine.

"Q. Had the informant given you any information regarding whether or not he believed the car was stolen, altered or in some way other than under legal ownership?

"A. Yes, that it was altered identification.

"Q. About how long did you observe the defendant Blouin go in and out of this car you have described?

"A. Approximately a half hour."

It is now argued that, under the holding of *People* v. *Borunda,* 11 Cal.3d 523, 527 [113 Cal.Rptr. 825, 522 P.2d 1], to the effect that: " ' "in view of the evidence, the informer would be a material witness on the issue of guilt and nondisclosure of his identity would deprive the defendant of a fair trial." [Citations.] That burden is discharged, however, when defendant demonstrates *a reasonable possibility that the anonymous informant whose identity is sought could give evidence on the issue of guilt which might result in defendant's exoneration.'* (*People* v. *Garcia* (1967) 67 Cal.2d 830, 839-840 [64 Cal.Rptr. 110, 434 P.2d 366],

italics added, fn. omitted.)" the informant's identity and address should have been disclosed.

It is difficult to visualize in the instant case how the informant can be said to have been an eyewitness to the crime or was possessed of knowledge from which he could give admissible testimony as to defendant's state of mind. Stated in another way, how could he, from personal knowledge, be expected to negate a mental state peculiar to defendant. In this case the informant did no more than advise the authorities of a state of facts, which to him required investigation. It is not shown that he participated in the crime or was possessed of any knowledge which might have exonerated defendant. He simply triggered an investigation by reporting a suspicious situation, an act which if not commonplace should be so these days. Defendant's participation in the crime itself was revealed by subsequent police investigation without resort to further information from the informant. For us to conclude that the informant could give testimony exonerating defendant requires resort to speculation. However the record does establish that the informant was aware of sufficient facts relative to defendant's possession and claimed ownership of the vehicle to permit of such a speculative possibility.

Before the 1969 amendment to Evidence Code section 1042, the ability to so speculate would render questionable the trial court's implied finding that it was not reasonably possible that the informant could provide exculpatory evidence. In *People v. Hunt,* 4 Cal.3d 231, 240 [93 Cal.Rptr. 197, 481 P.2d 205], our Supreme Court characterized the holding in *People v. Garcia,* 67 Cal.2d 830 [64 Cal.Rptr. 110, 434 P.2d 366], with respect to the speculation involved as follows: "[I]n Garcia we could only speculate that he had such information. . . ." (4 Cal.3d at p. 240.) Yet the holding in *Garcia* was that disclosure was required. (67 Cal.2d at p. 841.) The effect of the 1969 amendment to Evidence Code section 1042 is explained in *People v. Pacheco,* 27 Cal.App.3d 70, 80 [103 Cal.Rptr. 583], where the court said:

"In *People v. Garcia, supra,* 67 Cal.2d 830, 840, the court quoted from *People v. Castiel* (1957) 153 Cal.App.2d 653, 659 [315 P.2d 79]: ' "No one knows what the undisclosed informer, if produced, might testify. He might contradict or persuasively explain away the prosecution's evidence." '

"These cases are dealing with what little showing is necessary to be made by the defendant to be entitled to the identity of the informer. The showing is not as to what he would testify but as to what he might testify. In *People* v. *Hunt, supra,* 4 Cal.3d 231, 240, it is indicated that the court might 'speculate' that the informer might have information of benefit to the defendant.

"However, section 1042 of the Evidence Code has changed the situation. While the defendant may make out a prima facie case for disclosure, as here, the court now has a method of determining whether the nondisclosure of the identity of the informer would deprive the defendant of a fair trial, which section 1042 expressly makes the test to be applied."

It is apparent that the speculative possibility that the informant might possess exculpatory information could well have been investigated by an *in camera* hearing pursuant to Evidence Code section 1042, subdivision (d), and should have been so determined in the instant case. Said section requires such hearings whenever the prosecuting attorney requests them. No such request was made in this case. In order to eliminate the speculation which is inherent in any case where the record discloses that the informant possesses substantial knowledge of relevant facts such an *in camera* hearing should be requested by the prosecution in order to eliminate the speculation frowned upon in *Garcia.*

In the instant case the prosecution should be given the opportunity to prove in an *in camera* hearing the informant's lack of any information in this respect. If it should succeed in doing so, the court will be obliged not to order disclosure and its denial of defendant's motion to disclose the identity and the conviction shall stand. If the People do not choose to request such hearing, or if the informant's lack of exculpatory information is not established an order for disclosure will be required.

Finally, it is contended that the reference to the enhanced consecutive sentence for use of a firearm specified in Penal Code section 12022.5 must be stricken because the trial court's ordering "all sentences to run concurrently in this matter" had that effect.

While reasonably satisfied that this contention is lacking in merit under the rationale of *People* v. *Hunt,* 19 Cal.3d 888, 896-897 [140 Cal.Rptr. 651, 568 P.2d 376], in view of the serious effect attributable to a finding that the use allegation is true under Penal Code section 12022.5

and out of an abundance of caution, defendant should be resentenced in order to enable the trial court to clarify its intention with respect to this phase of the matter.

The judgment is reversed and the cause remanded for further proceedings consistent with the views set forth herein.

Potter, J., and Goertzen, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.