[No. G037004. Fourth Dist., Div. Three. Dec. 21, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER JAMES CHAKOS, Defendant and Appellant.

358

COUNSEL

Kristin A. Erickson, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Erika Hiramatsu and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SILLS, P. J.—

## I. INTRODUCTION

California's Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5) allows a qualified patient to lawfully possess eight ounces of marijuana for a medical condition, and possibly more if a doctor makes a formal recommendation that eight ounces is insufficient for the patient's needs.[1] Christopher James Chakos had a formal certificate from his doctor for lawful marijuana consumption under the Compassionate Use Act, with a recommended dosage of about "one quarter to one half ounce per week."

Chakos was found to have a total of six ounces of marijuana in his possession, which is two ounces less than the amount he was entitled to have under the Compassionate Use Act. Chakos was prosecuted and subsequently convicted for possessing his marijuana *for sale* based on the opinion testimony of the arresting officer, even though that officer had only the most tenuous knowledge of the patterns of *lawful* possession of marijuana under state law.

In *People v. Hunt* (1971) 4 Cal.3d 231 [93 Cal.Rptr. 197, 481 P.2d 205] (*Hunt*) our Supreme Court was faced with similar circumstances, albeit involving a defendant who had a prescription to lawfully possess methedrine as distinct from marijuana. In *Hunt,* the court held that a narcotics officer's expert opinion, that the methedrine—otherwise lawfully in the defendant's possession by virtue of a prescription—was being possessed for sale, was

---

[1] Under Health and Safety Code section 11362.77, subdivision (a), "A qualified patient or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient." That is, eight ounces is the legal limit, unless, pursuant to subdivision (b) of the same statute, a doctor makes a formal recommendation that eight ounces "does not meet the qualified patient's medical needs."

*insufficient* to sustain a conviction for possession for sale because the officer did not have sufficient expertise with the *lawful* use of the drug.

Following *Hunt,* we must reverse the conviction. Nowhere in this record do we find any substantial evidence that the arresting officer had any expertise in differentiating citizens who possess marijuana lawfully for their own consumption, as distinct from possessing unlawfully with intent to sell. (See *Hunt, supra,* 4 Cal.3d at pp. 237–238.)

## II. THE FACTS

### A. The Arrest

On December 9, 2004, Deputy Sheriff Christopher Cormier, who would be the prosecution's sole witness, arranged for a "black and white car [to] stop" Chakos's car near Antonio Parkway and the 241 Freeway. Chakos gave permission for officers to search his vehicle. The search of the car yielded a backpack which contained:

—a plastic bag containing seven grams of marijuana (which, at 28.5 grams per ounce, works out to just a little less than a quarter of an ounce);

—$781 in cash; and

—a doctor's medical slip for lawful marijuana use.

There was also a search of Chakos's apartment right after the traffic stop. (The record does not give the circumstances leading to the apartment search.) During that search Chakos led officers to his bedroom closet where they found:

—a little less than six additional ounces of marijuana, in different storage devices, and in *irregular* amounts;[2]

—99 empty baggies—described by Cormier, interestingly enough, as "blood evidence or phlebotomy bags." It is undisputed that Chakos is a phlebotomist by profession;

---

[2] The officer's testimony to the jury was: "The closet, I found one glass jar containing 25 grams of marijuana. Ziplock bag containing 90 grams of marijuana. Another large ziplock bag containing 42 grams of marijuana. One large ziplock bag containing eight grams of marijuana. Approximate weights." The total amounted to 165 grams, which, at the rule-of-thumb 28.5 grams-per-ounce conversion rate, equals about 5.78 ounces. Doing the conversions for the different containers shows a series of irregular amounts: The glass jar contained just less than an ounce. The 90-gram ziplock bag contained 3.16 ounces. The 42-gram ziplock bag contained 1.47 ounces. And the large ziplock bag contained .28 ounces.

—a digital gram scale.

Deputy Cormier also found a closed-circuit camera system allowing the viewing of anyone walking up to the front door.

### B. The Prosecution's Case: One Witness, Both Percipient and Expert

Chakos was subsequently prosecuted for possessing marijuana *for sale.* On the day of trial the prosecution filed a proposed witness list consisting of four possible witnesses, all of whom were from the Orange County Sheriff's Department. As it turned out, only one was called: Deputy Cormier, who testified both to the facts of the arrest as a percipient witness and also gave his opinion as an expert witness.

#### 1. *Qualifications as Expert*

Here is the evidence presented concerning Cormier's qualifications as an expert: He had 680 hours of "general" training at the academy and 270 hours of "narcotics training" which included "packaging, different types of drug identifications, growing marijuana, selling marijuana" and "packaging marijuana." He had been in the county sheriff's narcotics unit for six years. He had assisted more than a hundred "investigations for possession of [*sic*] sale of narcotics." He had spoken to people who sell narcotics and to people who buy narcotics, including the amounts bought, sold and used. He had seen marijuana before, and could tell the plant just by looking at it, as well as knowing the plant's "unique odor." He had seized "indoor grows" between one small plant and 150 plants.

#### 2. *Opinion as Expert*

In his role as expert, Cormier testified that the "totality of the circumstances" led him to the conclusion that the marijuana (about six ounces total) was being possessed for sale. His initial statement was: "My opinion is based on several things. Usually totality of situation."

The officer was particularly impressed by the *precise* quantity of marijuana *found in the car.* He said that "the amount that was found in the car, is not packaged for personal use. It's more consistent with what you would have to transport to sell to somebody with the money in the car." In that regard he had stressed that "drug dealers" use scales "to measure out weights, amounts consistent with pricing, *quarters, eighths,* so they know that the customers are getting the right amount." (Italics added.)

Other factors included the presence of packaging material, the presence of a scale, and the presence of a surveillance camera system. Cormier testified that he "consider[ed] all the evidence in making" his "opinion."[3]

## C.   The Defense Case

### 1.   *One More Fact on the Expert's Qualifications*

After the prosecution rested, cross-examination brought out this additional fact about Cormier's general experience: When asked if he had "arrested other people in possession of [a] physician's statement for receipt of marijuana?" he answered, "I don't think I've actually arrested anybody with one." Then, when asked if this case was his "first" such arrest, he answered, "I've contact with investigations, but for me to personally arrest somebody with one, I think this might be the first one."

### 2.   *Chakos's Profession as a Phlebotomist*

Chakos's work as a phlebotomist also came out on cross-examination, when Cormier testified that the traffic stop was made at a point where Chakos was "leaving his office," working as a phlebotomist for a particular medical group. Defense counsel asked Cormier whether Chakos "takes blood specimens for a living"—to which Cormier answered a straight "yes"—and also asked whether Cormier had verified that fact: Cormier testified that he had called the particular medical group for whom Chakos worked, "but they didn't want to provide any information."

### 3.   *The Defense in Chief*

Chakos's defense consisted of testimony from three witnesses:

---

[3] Some of the basis for Cormier's opinion was what *third parties* had told him about Chakos's *personal* circumstances. For example, Cormier was asked: "What about that fact it was—was there—did somebody tell you that the camera belonged to Mr. Tyler, Mr. Chakos' brother?" and, in the middle of his answer, Cormier strayed into answering a question that the prosecutor hadn't asked, essentially: "did anybody give you reason to believe that the camera didn't belong to Mr. Tyler?" That is, Cormier continued in his narrative: "I called Tyler's father. He explained to me that Tyler doesn't live at that residence, that's his mother's and his brother's apartment. And his mother is out of town quite frequently and he stays at the apartment maybe two or three times a month. [¶] So even though that it is Tyler's camera, it is set up in his brother's bedroom, he's letting his brother use it. And I didn't see any justification for it being in there. He [apparently the brother] couldn't explain why it was at his brother's house."

Because we conclude that *Hunt, supra*, 4 Cal.3d 231, requires reversal based on insufficiency of the evidence because of Cormier's lack of qualifications as an expert witness, we are spared the difficult issue raised in the briefs of whether Chakos's retained counsel's failure to request a curative instruction to the hearsay upon which Cormier explicitly relied in forming his opinion constituted ineffective assistance of counsel.

(1) His doctor who prescribed him marijuana for his pain and depression. The doctor also said that he had recommended a "dosage" of "one quarter to one half ounce per week." (At one point in the presentation of the doctor's testimony the prosecutor wanted to attack the bona fides of the physician's certificate. The trial court did not permit the prosecutor to develop that theme, so we are left with a record with uncontradicted evidence that Chakos was entitled to possess eight ounces of marijuana.)

(2) His stepmother who testified that she indeed bought his brother the surveillance equipment. She said she paid $400 for it at Radio Shack including "all the little attachments."

(3) His half brother Tyler, who testified that he was "living at the house at that time." Tyler said he shared the apartment with Chakos and their mother and installed the camera system himself. On cross-examination Tyler stated that Chakos never smokes marijuana in his room, and never smokes marijuana around him.

### D.   The Result of the Trial and the Arguments on Appeal

The jury convicted Chakos of possessing marijuana for sale. (Health & Saf. Code, § 11359.) He was placed on probation for three years.

On appeal, Chakos argues that there was both insufficient evidence to sustain the conviction given his physician's certificate and the proposition that Deputy Cormier's opinion that Chakos possessed marijuana for sale was outside his area of expertise under *Hunt, supra*, 4 Cal.3d 231. He also contends that his trial counsel was ineffective because of the hearsay he allowed to come in under the guise of expert testimony, which effectively gutted his defense. Because the former argument is well taken, we need not deal with the latter.[4]

## III.   DISCUSSION

In *Hunt, supra*, 4 Cal.3d 231, the defendant was discovered by police officers in an acquaintance's apartment with a hypodermic needle in his right arm. The syringe contained two cc's (cubic centimeters) of methedrine. At the defendant's feet was a travel case with four vials of methedrine. The defendant, however, had had prescriptions for the four vials of methedrine, filled in connection with a diagnosis of "lethargy, a type of narcosis." (*Hunt,*

---

[4] See footnote 3, *ante.*

*supra*, 4 Cal.3d at pp. 234–235.)[5] The defendant's acquaintance was found to have a notebook which had "a number of entries in it such as '2-5-68, pay $20 for deal on two vials of meth,' " though there was no entry that stated that "anything was sold." (*Hunt, supra*, 4 Cal.3d at p. 234.)

As here, the prosecution presented the opinion testimony of an arresting officer *qua* expert to make the link from the defendant's possession pursuant to a prescription to his alleged possession for sale. The Supreme Court described the officer's expertise this way: He had "extensive training, education, and experience relating to the possession of and trafficking in dangerous drugs." (*Hunt, supra*, 4 Cal.3d at p. 234.) He also knew what regular users of methedrine took ("up to 8 ccs. a day"), and he knew the "going price for the illegal sale." (Which was "about $30 for a 30-cc. vial.") (*Ibid.*)

The officer opined that the methedrine found in defendant's possession was "possessed for sale." His opinion was based on the quantity involved, the overall street value, and " 'the normal use by an individual.' " (*Hunt, supra*, 4 Cal.3d at pp. 234–235.)

After a conviction and an appeal, the Supreme Court held the evidence was insufficient to sustain the judgment. (*Hunt, supra*, 4 Cal.3d at p. 238.) The court began its analysis by recognizing that the evidence of possession for sale might indeed have been sufficient in a case where there was *no possibility of lawful possession*: "In cases involving possession of marijuana and heroin, it is settled that an officer with experience in the narcotics field may give his opinion that the narcotics are held for purposes of sale based upon matters such as quantity, packaging, and the normal use of an individual. On the basis of such testimony convictions of possession for purposes of sale have been upheld. [Citations.]" (*Id.* at p. 237.)

But then the court added: "*A different situation is presented* where an officer testifies that in his opinion a drug, which can and has been lawfully purchased by prescription, is being held unlawfully for purposes of sale. In the heroin and marijuana situations, the officer experienced in the narcotics field is experienced with the habits of both those who possess for their own use and those who possess for sale *because both groups are engaged in unlawful conduct.* As to drugs, which may be purchased by prescription, the officer may have *experience with regard to unlawful sales but there is no reason to believe that he will have any substantial experience with the numerous citizens who lawfully purchase the drugs for their own use as medicine for illness.*" (*Hunt, supra*, 4 Cal.3d at pp. 237–238, italics added.)

---

[5] In *Hunt,* in parallel with this case when the court disallowed the inquiry into the bona fides of the prescription, the legal analysis was independent of the defendant's underlying actual need for the drug. The Supreme Court in *Hunt* accepted the defendant's prescription for methedrine at face value.

We must recognize here that the *Hunt* court's initial reference to "marijuana and heroin" is prior to the enactment of the Compassionate Use Act, and was made at a time when *no* possession of marijuana was lawful, under either state or federal law. When the passage is read *in context,* the *Hunt* court was merely contrasting previous cases where *any* possession of a given drug would not be a lawful one from the case in front of it, where there was a possibility of lawful possession.

■ Next, having already emphasized the dichotomy between "unlawful conduct" and the lawful purchase by citizens of "drugs for their own use as medicine for illness," the *Hunt* court turned its focus to the need for circumstances *differentiating* lawful use as a medicine from unlawful possession for purposes of sale. The court said: "In the absence of evidence of some circumstances not to be expected in connection with a patient lawfully using the drugs as medicine, an officer's opinion that possession of lawfully prescribed drugs is for purposes of sale is worthy of little or no weight and should not constitute substantial evidence sufficient to sustain the conviction." (*Hunt, supra,* 4 Cal.3d at p. 238.)

The *Hunt* court then turned its attention to those circumstances about which the officer had actually testified: the quantity, the street value, and normal use. The court concluded that none of those were "such special circumstances" as to show possession *for sale.* (*Hunt, supra,* 4 Cal.3d at p. 238.)[6]

Both in its brief and at oral argument the Attorney General has had a difficult time distinguishing *Hunt* from the case before us. We quote the *entirety* of the Attorney General's thoughts from his respondent's brief on the applicability of *Hunt* to this case in the margin. His argument, however, essentially comes down to the idea that the methedrine in *Hunt* cannot be equated with marijuana in this case because the defendant in *Hunt* had a "prescription" for it, while Chakos here has only a "recommendation."[7]

---

[6] The passage from *Hunt* was: "The officer stated that his opinion that the methedrine was held for sale was based on 'the quantity involved, the over-all street value, the normal use by an individual.' Under his own testimony, the use by an individual could be up to 8 ccs. a day. The quantity in the blue and white travel case was less than 120 ccs. and could have been as little as a two-week supply. The street value seems immaterial. The fact that medicine purchased lawfully at reasonable prices may demand a much greater price in the illegal market furnishes no reason to suppose that a possession of a two-week supply of the drug pursuant to prescription is held for profit rather than use." (*Hunt, supra,* 4 Cal.3d at p. 238.)

[7] Here is the passage from the respondent's brief:

"Appellant's reliance on *People v. Hunt* (1971) 4 Cal.3d 231, does not assist him. (AOB 13-14.) There, the court held that in cases involving possession of marijuana or heroin, experienced officers may give their opinions that the narcotics are held for sale based upon matters such as quality, packaging, and the normal use by an individual. (*People v. Hunt, supra,*

■ The Attorney General, however, relies on a distinction without a difference. *Hunt* was decided under *state law,* and the case involved a prosecution under *state laws* that forbid possessing certain drugs for sale, specifically sections 11911 and 11910 of *California's* Health and Safety Code. (See *Hunt, supra,* 4 Cal.3d at pp. 233, 235–236.) *Hunt's* rationale depended on the possibility of lawful use under state law and therefore the need of an officer-expert to be able to distinguish patterns of lawful from otherwise unlawful use. The fact that the Compassionate Use Act may allow lawful possession under state law pursuant to a physician's "recommendation," as distinct from a formal "prescription," has nothing to do with what the *Hunt* case said about expert witnesses, since, in 2007, regardless of whether marijuana is possessed pursuant to a "prescription" or pursuant to a "recommendation," it *can* be possessed lawfully under state law the same as the defendant in *Hunt* could lawfully possess his methedrine under state law.

■ No California Supreme Court case has narrowed *Hunt* in the ensuing years, and we are thus bound by it. (See *Auto Equity Sales, Inc. v. Superior*

---

4 Cal.3d at p. 237.) As to prescription drugs, which may be legally purchased with a prescription, the court found the officer's experience with unlawful drug sales did not necessarily show he had experience with citizens who lawfully purchase the drugs for their own use as medicine for illness. (See *id.* at pp. 237–238.) Accordingly, the court held that absent circumstances beyond quantity, packaging and normal use, such testimony was insufficient to sustain the judgment. (*Id.* at p. 238.)

"The instant case involves marijuana, however, not prescription medication. Under federal law, marijuana is a Schedule I substance that cannot be dispensed and prescribed for medicinal use. (United States v. Oakland Cannabis Buyers' Cooperative (2001) 532 U.S. 483, 491 [parallel citations]; see 21 U.S.C. § 829.) Accordingly, the CUA does not use the term 'prescription,' but refers to a physician's 'written or oral recommendation or approval.' (See Health & Saf. Code, § 11362, subd. (d).) Thus, *People v. Hunt* is inapplicable. (See People v. Harris (2000) 83 Cal.App.4th 371, 374–375 [99 Cal.Rptr.2d 618].)"

In addition to our comments in the text, we observe that it is a misreading of *Hunt* to say that it "held" that "in cases involving possession of marijuana or heroin, experienced officers may give their opinions that the narcotics are held for sale based upon matters such as quantity, packaging, and the normal use by an individual." *Hunt held* no such thing.

*Hunt observed,* in order to contrast its facts with previous decisional law, that in cases "involving possession of marijuana and heroin, it [was] settled" that an officer "with experience in the narcotics field" could give his opinion that the marijuana or heroin was being held for sale "based upon matters such as quantity, packaging, and the normal use of an individual." (*Hunt, supra,* 4 Cal.3d at p. 237.) *Hunt* didn't *hold* that, it merely made an observation to buttress its rationale—the case didn't involve a marijuana or heroin prosecution for sale. And, as we note in the text, at the time the *Hunt* court made that *observation,* there was *no possibility* of possessing marijuana or heroin lawfully, under either federal or state law. At the time *Hunt* was decided, a case involving marijuana or heroin would not require an expert to distinguish patterns of lawful from unlawful use—*all* marijuana use was unlawful when the *Hunt* court wrote. (And as to heroin, it still is, and the observation in *Hunt* retains just as much legal force today as it did in the early 1970's.)

*Court* (1962) 57 Cal.2d 450, 455–456 [20 Cal.Rptr. 321, 369 P.2d 937] [intermediate appellate courts have no jurisdiction to refuse to follow binding precedent of state supreme court].) (Most subsequent cases have discussed *Hunt* in the context of its second rationale, involving disclosure of informants.) *People v. Newman* (1971) 5 Cal.3d 48 [95 Cal.Rptr. 12, 484 P.2d 1356] involved what the *Hunt* court considered the more typical situation, where an officer's opinion as to possession for sale was offered in a context where there was no possibility of lawful possession for medicinal use. (See *Newman*, at p. 52.)

Published decisions at the intermediate appellate level offer no basis to distinguish it here either, and in fact *People v. Doss* (1992) 4 Cal.App.4th 1585 [6 Cal.Rptr.2d 590] *(Doss)* impliedly recognized the importance which *Hunt* laid on expertise in distinguishing between patterns of lawful use and patterns of diversion of otherwise lawfully possessed drugs. *Doss* is like the present case because it also involved someone (a pharmacist) who could possess drugs lawfully. The concern in *Doss* was whether, as here, the drugs the pharmacist could otherwise lawfully possess were being diverted to illicit sales. But the conviction in *Doss* was supported by an officer who "had particular expertise in the area of illegal distribution of *pharmaceuticals.*" *(Doss, supra*, 4 Cal.App.4th at p. 1595, italics added; see also *id.* at p. 1594 [reference to agent's expertise in "scheduled pharmaceutical drugs" and "scheduled pharmaceuticals"].)

Since expertise in "pharmaceuticals" necessarily includes expertise in both *lawful* as well as unlawful substances, to have expertise in their "illegal distribution" implies an expertise in their legal distribution as well, so as to be able to *tell the difference.* Indeed, in the context of typical pharmaceuticals, it is impossible to imagine an expert who knew about their "illegal distribution" without necessarily also knowing about their *legal* distribution. The *diversion* of otherwise *legal* drugs from pharmacies is its own special area of the law, complicated by the fact that the *norm* is for pharmaceuticals to be distributed through controlled channels. (See generally deKieffer, *Trojan Drugs: Counterfeit and Mislabeled Pharmaceuticals in the Legitimate Market* (2006) 32 Am. J. L. & Med. 325; Van Hook, *Securing the Global Supply Chain: Evolving Federal/State Law—Prescription Drug Distribution, Counterfeit, Pedigree Requirements, and the Internet* (2006) 878 PLI/Pat 909; e.g., *Smith v. State Bd. of Pharmacy* (1995) 37 Cal.App.4th 229 [43 Cal.Rptr.2d 532].) The same cannot be said for marijuana under the Compassionate Use Act.

■ But that kind of expertise—expertise in distinguishing lawful patterns of possession from unlawful patterns of holding for sale—is what is conspicuously missing in the case before us. As with the officer in *Hunt,* Deputy

Cormier's expertise is in cases where defendants *by definition* "are engaged in unlawful conduct." (*Hunt, supra,* 4 Cal.3d at p. 237.) The only evidence on the point was that he had "contact with investigations" concerning such individuals. Mere and undefined "contact" with undefined "investigations" is manifestly not *substantial* evidence that an officer is in any way familiar with the patterns of individuals who, under state law, may lawfully purchase marijuana pursuant to a physician's certificate under the Compassionate Use Act, nor does it show any expertise in the ability to distinguish lawful from unlawful possession.

Indeed, Cormier's lack of expertise in distinguishing lawful from unlawful possession is revealed in some of his own testimony. He laid great stress on the fact that about a quarter-ounce of marijuana was found in Chakos's backpack when he was arrested. And, of course, intuitively, such a precise amount would seem consistent with drug dealing, since it represents ease of packaging: take an ounce, divide by half, divide each of those halves by half. (Hence Cormier's reference in his testimony to "amounts consistent with pricing, *quarters, eighths.*")

But what are we to make of Cormier's percipient testimony that Chakos was found to have *irregular* amounts found in his closet? Merely taking Deputy Cormier's own testimony at face value, a reasonable trier of fact might infer that the *irregular* amounts of marijuana were inconsistent with dealing and were consistent with *lawful* use under the Compassionate Use Act. Such an inference also seems intuitive because, while marijuana may be lawfully *possessed* under the Compassionate Use Act, it is not exactly easily *obtainable* in open, licit circumstances (as would the pharmaceuticals in *Doss* in the normal context where they would be distributed lawfully).

One might posit, then, that individuals who may lawfully possess marijuana under state law for medicinal purposes will have patterns of purchase and holding that will reflect the practical difficulties in obtaining the drug. Those practical difficulties could also explain the gram scale—anyone with the lawful right to possess marijuana will need to take precautions, not to ensure that he or she does not get "ripped off" by a dealer, but that he or she does not possess *more than* the eight ounces contemplated by the act. Practical difficulties of obtaining the drug also explain why a patient entitled to possess it under state law might want to keep an extra supply on hand *within* the legal amount, since supplies would not be reliable.

Now, are these *speculations* to be rejected because contradicted by the expert's testimony on the record? No—and *that* is the point: The *record* fails to show that Deputy Cormier is any more familiar than the average layperson

or the members of this court with the *patterns of lawful possession for medicinal use* that would allow him to differentiate them from unlawful possession for sale.

In other words, Cormier was unqualified to render an *expert* opinion in this case. Under *Hunt,* that means there was insufficient evidence to sustain the conviction. (See *Hunt, supra,* 4 Cal.3d at p. 238.)

## IV. DISPOSITION

The judgment is reversed.

Aronson, J., and Fybel, J., concurred.

On January 17, 2008, the opinion was modified to read as printed above.