Filed 12/3/14  P. v. Morais CA3

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES SHANNON MORAIS,<br><br>    Defendant and Appellant. | C075228<br><br>(Super. Ct. No. CR029407) |

A jury convicted defendant James Shannon Morais of possession of a firearm by a convicted felon, possession of a short-barreled shotgun, cultivation of marijuana, and possession of marijuana for sale.  The jury also found true certain enhancement allegations.  The trial court sentenced defendant to seven years eight months in state prison.

1

Defendant now contends (1) there is insufficient evidence to support his convictions for cultivation of marijuana and possession of marijuana for sale, and (2) the trial court failed in its sua sponte duty to instruct the jury that compassionate use is a defense to possession of marijuana for sale.

We conclude substantial evidence supports the marijuana convictions, and the trial court did not have a sua sponte duty to instruct regarding compassionate use. We will affirm the judgment.

BACKGROUND

In November 2011, defendant was living with Julie Morais, Carrie Evans and Carbon Morais in a fifth-wheel trailer on the property of defendant's father, Forrest Morais.[1] The property was 11 to 12 acres; Forrest lived with his four daughters in the main house on the property. There was also a shed on the property, along with a green and white trailer. The shed was between the fifth wheel and the main house.

Lassen County Sheriff's Deputy Shannon Parker went to the property on November 30, 2011, and Forrest gave him permission to enter the shed. Forrest had not been in the shed since the previous summer, and his daughter Jamie Lynn Morais had not been in it for about a year. Jamie Lynn had not entered the shed for so long because "everything from the pool yard off into the desert was [defendant's] area. You don't cross him, you don't go into his area."

Deputy Parker found four shotguns inside the shed. One had a short barrel that looked as if it had been cut off. A shotgun barrel was found in the green and white trailer. Officers also found four containers inside the shed. One container held marijuana packaged in one-gallon Ziploc bags, and another container held marijuana shake. Shake is what is left over from processing marijuana plants; it can be smoked but is not as

---

[1] Because some individuals share the same last name, we refer to certain individuals by their first names for clarity.

2

effective as the buds of the marijuana plant. A third container held more processed marijuana in plastic bags. There was also a digital scale in the shed.

Outside there were water lines and a large barrel on a table, with what appeared to be little white tags for plants. The tags read "BBK," "OG Kush," "Grape Wreck," "Grape Ape," "Grand Daddy," and "Grand Daddy Purps." Some of these names were also found on the bags of marijuana found in the shed.

Lassen County Narcotics Task Force Officer David Woginrich went to the Morais property and identified items taken from the shed. He found the following: a Ziploc bag of marijuana; a clear garbage bag containing 3.8 pounds of marijuana; several individual bags of marijuana, weighing one pound each, labeled "Grape Wrek," "OG," "BBKC," "BBK Clone," and "1 Grape Wrek"; a clear plastic bag with the writing "1BBK5" or "BBKS" containing 0.8 pounds of marijuana; an unlabeled bag of marijuana weighing 1.2 pounds; a one-pound bag of marijuana labeled "380 G X-Ray 13"; a bag of shake weighing 19.4 pounds; and several containers of marijuana weighing 0.2, 0.4, 0.6, or 0.8 pounds. In total, the items take from the shed included 40.2 pounds of marijuana (composed of about 20 pounds of shake and 20 pounds of marijuana bud) and two digital scales.

Testifying as an expert on marijuana sales, Officer Woginrich opined that the marijuana was possessed with the intent to sell. His opinion was based on the large amount of marijuana and the way it was packaged in common weights for street level marijuana sales. He said the two digital scales supported his opinion.

Ten medical marijuana recommendations were found inside the fifth-wheel trailer. Defendant and Carrie had recommendations for one to two ounces of marijuana per week. The remaining eight recommendations were for Julie and seven other individuals; those recommendations did not specify a recommended amount of marijuana.

Forrest had a recommendation for medical marijuana but did not store his marijuana in the shed. He kept personal property in the shed but did not own any of the

firearms. He grew marijuana behind the house with the help of his daughter Jamie Lynn, who also had a medical marijuana recommendation. She did not keep firearms or marijuana in the shed.

Defendant told Officer Woginrich that only a couple of the people whose medical marijuana recommendations were found in the trailer actually lived with him. Defendant said he provided medical support and services to those people, but he had no documentation showing he was a licensed caregiver. He believed he was allowed to possess up to two pounds and thought he had six pounds of marijuana. According to defendant, he and his father were "kind of" partners; they would grow their plants together and share the marijuana after processing it. Defendant's friends gave their medical marijuana recommendations to him and he would grow the marijuana on the property for them. He denied owning the guns.

Carrie testified for the defense. She said Forrest put bales of hay at the end of a makeshift firing range. Because Forrest was in a wheelchair, Carrie would bring him the guns from the shed when he wanted to shoot. Forrest always had marijuana and kept it in "Ziplocks and in turkey bags." Carrie grew marijuana on the property and so did Forrest, defendant, Julie, and another person.

The jury convicted defendant of possession of a firearm by a convicted felon (former Pen. Code, § 12021, subd. (a) -- count I),[2] possession of a short-barreled shotgun (former Pen. Code, § 12020, subd. (a) -- count II),[3] cultivation of marijuana (Health & Saf. Code, § 11358 -- count III), and possession of marijuana for sale (Health & Saf. Code, § 11359 -- count IV). The jury also found true allegations that defendant had two

---

[2] Former Penal Code section 12021, subdivision (a) was subsequently repealed and reenacted without substantive change as Penal Code section 29800, subdivision (a).

[3] Now Penal Code section 33215.

prior convictions for violating Health & Safety Code sections 11359 and 11366 (Pen. Code, § 667.5).[4] The trial court sentenced defendant to seven years eight months in state prison.

DISCUSSION

I

Defendant contends there is insufficient evidence to support his convictions for cultivation of marijuana and possession of marijuana for sale. Specifically, he argues Officer Woginrich was not qualified to give an expert opinion that the marijuana was not lawfully cultivated and possessed for defendant's medical use.[5]

"To determine whether the prosecution has introduced sufficient evidence to meet [its burden of proving every element of a crime beyond a reasonable doubt], courts apply the 'substantial evidence' test. Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' [Citation.]" (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261, italics omitted.)

Defendant relies on *People v. Hunt* (1971) 4 Cal.3d 231 (*Hunt)* and *People v. Chakos* (2007) 158 Cal.App.4th 357 (*Chakos*), but those cases do not assist him. To

---

[4] Undesignated statutory references are to the Health and Safety Code.

[5] In *People v. Dowl* (2013) 57 Cal.4th 1079 (*Dowl*), the California Supreme Court held that if a defendant fails to object at trial to a proffered expert's qualifications, his challenge on appeal to the expert's qualifications is forfeited, but he can still argue on appeal that the evidence, including the expert testimony, was insufficient to establish that the defendant possessed the marijuana for sale. (*Id.* at pp. 1088-1089.)

understand why, we briefly discuss *Hunt*, *Chakos* and a more recent case, *Dowl, supra,* 57 Cal.4th 1079.

In *Hunt,* an officer found the defendant with, among other things, pharmacy-labeled vials of methedrine with the defendant's name on them. (*Hunt, supra*, 4 Cal.3d at pp. 233-234.) A jury convicted defendant of unlawful possession for sale of a restricted dangerous drug based on the expert testimony of an officer, but the California Supreme Court held the evidence was insufficient to support the conviction. (*Id.* at pp. 233, 238.) There was evidence that the testifying officer had extensive training and experience regarding unlawful drug use and trafficking, but there was no evidence that the officer had experience regarding lawful use of the drug as medicine. (*Id*. at pp. 234, 237-238.) Absent evidence of unusual circumstances regarding the lawful use of drugs, "an officer's opinion that possession of lawfully prescribed drugs is for purposes of sale is worthy of little or no weight and should not constitute substantial evidence sufficient to sustain the conviction." (*Id.* at p. 238.)

In *Chakos*, a defendant who possessed six ounces of marijuana was convicted of possession for sale based on the testimony of the arresting deputy sheriff, who testified as both a percipient and expert witness. (*Chakos, supra*, 158 Cal.App.4th at pp. 359-361.) A search of the defendant's car and home yielded the marijuana, $781 in cash, a doctor's medical slip for lawful marijuana use, 99 empty baggies, a scale, and a closed-circuit camera system. *(Id*. at pp. 360-361.) According to the deputy, the totality of the circumstances led him to conclude the marijuana was possessed for sale. (*Id*. at pp. 361-362.)

The Court of Appeal in *Chakos* held that the deputy's testimony was insufficient to support the defendant's conviction. (*Chakos, supra*, 158 Cal.App.4th at pp. 368-369.) Although the deputy had substantial drug and narcotics training and experience, the deputy had never arrested anyone with a medical marijuana recommendation. (*Id.* at pp. 361-362.) Relying on *Hunt*, the Court of Appeal concluded the deputy lacked

6

expertise in the medical use of marijuana. (*Id.* at pp. 363, 368-369.) The court explained: "[T]hat kind of expertise -- expertise in distinguishing lawful patterns of possession from unlawful patterns of holding for sale -- is what is conspicuously missing in the case before us." (*Id.* at p. 367.) The court said there was insufficient evidence that the officer was familiar with the patterns of individuals who, under state law, may lawfully purchase marijuana pursuant to a physician's certificate under the Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5), and there was no showing of expertise in the ability to distinguish lawful from unlawful possession. (*Id.* at pp. 367-368.)

In *Dowl,* officers searched the defendant's car after a traffic stop and found "$21 in cash, a WD-40 can with a hidden compartment containing marijuana residue, and a total of over two ounces of marijuana: 17.2 grams in a single bag in defendant's pocket, three grams in each of 10 bags in the driver's door, and 6.5 grams in each of three bags on the backseat." (*Dowl, supra*, 57 Cal.4th at p. 1082.) Defendant did not appear to be under the influence and had nothing that would be used to ingest marijuana, such as a pipe or rolling paper. He wore a belt buckle which read, " 'CA$H ONLY.' " One of the arresting officers gave expert testimony that the marijuana was possessed for sale, based on the packaging and location of the marijuana, the " 'CA$H ONLY' " belt buckle and the absence of pay-owe sheets, and the fact that the defendant was on probation for a prior conviction for possession of marijuana for sale. (*Ibid*.) The defendant presented a defense that he possessed the marijuana for medical purposes, but the jury convicted him of unlawful transportation and possession of marijuana. (*Id.* at p. 1083.) The defendant argued on appeal that the evidence was insufficient to sustain his conviction because the expert "lacked experience distinguishing between lawful possession for medical use and unlawful possession for purposes of sale." (*Id.* at p. 1081.)

Among other things, the Supreme Court rejected defendant's argument that the evidence, including the officer's opinion testimony, was insufficient to establish he

possessed the marijuana for sale. (*Dowl*, *supra*, 57 Cal.4th at p. 1089.) Without deciding whether it would have reached the same conclusion as the court in *Chakos*, the Supreme Court in *Dowl* distinguished both *Hunt* and *Chako*s. (*Id*. at pp. 1092-1094.) The Supreme Court said the circumstances surrounding the possession in *Dowl* supported the officer's testimony in that case. (*Id*. at p. 1093.)

There may be cases presenting a close call as to whether the evidence supports an officer's opinion that marijuana is possessed for sale, but this is not one of them. The amount of marijuana found in defendant's possession in this case vastly exceeded the quantity of drugs found in *Hunt* or *Chakos*, and unlike in *Chakos*, the amount of marijuana possessed by defendant was not within the legal limit of what defendant could possess. Defendant had a prescription for one to two ounces a week, and could legally possess no more than 104 ounces, or six pounds eight ounces, in a one-year period. But here, the items taken from the shed included more than 40 pounds of marijuana, about 20 pounds of shake and 20 pounds of marijuana bud. While one person living with defendant also had a prescription for one to two ounces per week, defendant still possessed significantly more than the combined legal one-year limit.

In addition, defendant did not have any authorization to furnish marijuana to medical marijuana patients other than himself, further supporting the inference that the large quantity of marijuana was possessed for sale. Moreover, as in *Dowl*, the bulk of the marijuana was packaged in plastic bags in discrete amounts. Some of the marijuana bags were labeled to indicate different strains, a product differentiation consistent with commercial rather than medicinal use. And because defendant possessed far more than he could legally use in a year, the two digital scales suggest possession for sale rather than for medicinal use.

Based on Officer Woginrich's testimony and the other evidence presented, a reasonable factfinder could conclude that the marijuana was possessed for sale rather than

8

medicinal use.  Substantial evidence supports defendant's convictions for cultivation of marijuana and possession of marijuana for sale.

II

Defendant next contends the trial court failed in its sua sponte duty to instruct that compassionate use is a defense to possession of marijuana for sale.

The Compassionate Use Act provides, in part:  "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."  (§ 11362.5, subd. (d).)  The statute clarifies that "[n]othing in this section shall be construed . . . to condone the diversion of marijuana for nonmedical purposes."  (§ 11362.5, subd. (b)(2).)

Section 11362.765 expressly prohibits the cultivation or distribution of marijuana "for profit," but provides that specified individuals are not subject to prosecution for possession for sale of marijuana.  (§ 11362.765, subd. (a).)  An individual is exempt from prosecution under that section only if he or she is:  "(1) A qualified patient or a person with an identification card who transports or processes marijuana for his or her own personal medical use.  [¶]  (2) A designated primary caregiver who transports, processes, administers, delivers, or gives away marijuana for medical purposes . . . only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver.  [¶]  (3) Any individual who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver, in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person."  (§ 11362.765, subd. (b)(1)-(3).)

The first exemption applies only to a qualified patient whose possession of marijuana is for personal use, not to a person who possesses marijuana for purposes of

9

sale.  As for the second and third exemptions, defendant presented no evidence that he was a "primary caregiver" or that he "provide[d] assistance to a qualified patient or a . . . primary caregiver."  (§ 11362.765, subd. (b)(2) & (3).)  Defendant told Officer Woginrich that he collected all of his friends' medical marijuana cards, but this does not support an inference that he was a legally authorized caregiver or was assisting one.

Black's Law Dictionary defines "affirmative defense" (see "defense") as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true."  (Black's Law Dict. (9th ed. 2009) p. 482, col. 2.)  Possession of marijuana for sale requires an intent to sell.  Thus, to constitute an affirmative defense, defendant's status as a medical marijuana user must be sufficient to defeat this element of the offense.  It is not.

The fact that defendant was authorized to possess marijuana for medical purposes as a qualified patient did not entitle him to possess it for sale.  Although defendant was entitled to argue to the jury the relevance of his status as a medical marijuana user with regard to his intent, the trial court did not have a sua sponte duty to instruct the jury regarding the Compassionate Use Act.

DISPOSITION

The judgment is affirmed.

_____MAURO_____, J.

We concur:

_____BLEASE_____, Acting P. J.

_____BUTZ_____, J.

10