Filed 6/22/15  P. v. Morse CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JEREMIAH JON MORSE,<br><br>        Defendant and Appellant. | C075372<br><br>(Super. Ct. No. 11F05200) |

A jury found defendant Jeremiah Jon Morse guilty of possession for sale of marijuana and transportation of marijuana.  (Health & Saf. Code, §§ 11359, 11360, subd. (a).)[1]  The trial court suspended imposition of sentence and granted probation.  Defendant timely filed this appeal.

---

[1] Further undesignated statutory references are to the Health and Safety Code.

1

Defendant contends the trial court improperly permitted the introduction of certain expert testimony about marijuana laws and failed to orally impose certain fines and fees. He adds that he should not have been convicted of both possession for sale and transportation of marijuana. We modify the probation order and otherwise affirm.

**FACTS**

*Traffic stop*

Defendant and Justin James Castleman were stopped by California Highway Patrol (CHP) Officer Sean Gotts on July 22, 2011, and found with large amounts of cash, marijuana, and indicia of drug sales. Gotts saw Castleman driving a BMV without a rear license plate at 82 miles per hour, and pulled him over; defendant was in the front passenger seat. Gotts smelled unburnt marijuana.

When Castleman produced a California Identification Card instead of a driver's license, Gotts asked for and received the car keys, and asked Castleman where the marijuana was. Castleman opened the center console and produced a baggie of marijuana and a photocopy of a physician's medical marijuana recommendation card. When asked if there was more marijuana in the car, Castleman said no.

Defendant told Officer Gotts that he did not have identification with him, but when Gotts expressed doubts, defendant reached behind the driver's seat and produced a credit card with his name on it. When Gotts asked where defendant had found the card, defendant did not answer and Gotts had to repeat himself before defendant said, "From behind the driver's seat." Defendant was extremely nervous and shaky, "very shifty," and would not make eye contact. When Gotts asked defendant if his driver's license was there, defendant asked if he had to produce it. After being told he had to, defendant retrieved a box and put it on his lap. He then carefully raised the lid and then shifted his body so that Gotts could not see inside, not opening the box but instead slipping his hand underneath the lid. Gotts could see defendant "grasping around" inside the box.

2

Gotts saw a baggie in the box, and asked defendant if there was marijuana in the box; defendant said no, only a firework. Gotts ordered defendant to give him the box, and defendant asked if he had too, then complied. The box contained an M-80 firework, about an ounce of marijuana in the baggie Gotts had seen, digital scales, a list of different strains of marijuana with dollar amounts next to them, over $9,700 in cash, and defendant's driver's license.

After defendant and Castleman were handcuffed, Gotts searched the car and found a marijuana grinder in the driver's door, a heat-sealed baggie behind the front passenger seat that contained other baggies of marijuana, two air fresheners, and a duffel bag in the trunk containing three pounds of marijuana. Also in the trunk was a small jar of marijuana, nylon bags that had the remnants of marijuana leaves, and another plastic baggie of marijuana. Gotts then arrested both men, finding $2,700 in Castleman's wallet.

CHP Sergeant Robin Johnson found a chocolate cannabis bar in the trunk, and three cellular telephones, one in the driver's door, one charging in the center console, and one on the passenger's seat. The parties stipulated that certain images and text messages were retrieved through forensic examinations of defendant's cell phone, and both of Castleman's cell phones. In defendant's phone, Sergeant Johnson found texts indicating that defendant and Castleman were on their way to deliver marijuana, as well as regarding medication and prices. Thirty-six pages of texts from defendant's phone were introduced into evidence. They consist of numerous conversations about marijuana and pricing.

The parties stipulated that the suspected marijuana was analyzed by a criminalist and found to be marijuana.

*Prosecution expert testimony*

CHP Officer Robert Dimiceli qualified as a narcotics expert, including regarding marijuana use, transportation, and sales, and had received training regarding the Compassionate Use Act (CUA). Terms such as "OG Kush, Diesel, Pink Panther," and

3

others refer to different strains of marijuana, and text messages using such terms along with figures such as "1800 to 2200" would refer to pricing. A typical habitual marijuana user would smoke between three and five cigarettes (joints) consisting of a half-gram to one gram of marijuana per day. Three pounds would make about 1344 joints that would take years for one person to smoke, and Dimiceli had never seen a person possess such a large amount for personal use. Marijuana users do not store marijuana for long periods, because the potency decreases, and it can become moldy. It is uncommon for users to buy in large quantities; typically they buy one or two ounces. Depending on the strain, marijuana sells for between $1,800 and $6,000 per pound.

Without objection, in answer to a hypothetical question detailing the facts of this case, Officer Dimiceli opined the marijuana would be possessed for purposes of sale, based on the quantity, the indicia of sales such as the texts, and the cash.

The fact both persons in the car had medical marijuana cards would not change his opinion because the CUA was "very specific in the requirements for an individual to be in possession of marijuana, in addition to the card." After Dimiceli gave this answer, defense counsel objected based on lack of foundation for "defining the law." This objection was sustained, but counsel did not move to strike the answer.

When Dimiceli was asked how his training on the CUA had factored into his investigations, the following exchange occurred: "A. Well, the law is very specific when it comes to the [CUA]. In order to be able to do my job within the legal parameters -- [¶] [Defense counsel]: Objection. [¶] The Witness: --as-- [¶] [Defense counsel]: Foundation and nonresponsive. [¶] THE COURT: Overruled. [¶] You can answer." Dimiceli then testified in part that based on his training, "there are very specific amounts that an individual can be in possession of in order to be under compliance, or in order to possess marijuana legally under [the CUA]."

When asked whether consideration of the medical marijuana card would change his opinion in this case, Dimiceli replied it would not because "It's too much. Everything

4

is too much.  Too much marijuana . . . too much money.  All of the different pieces of information that you have related to me [i.e., in the hypothetical question], that is not something that a person that possesses marijuana for personal use would be . . . accompanied with."  No objection was lodged.  As to each person with a medical marijuana recommendation "there are specific amounts that each individual is allowed to possess."  He then testified text messages referencing different strains and prices such as 1800 or 2200 would refer to marijuana sales and that those figures were high dollar figures, beyond the norm for personal use.

On cross examination, defense counsel asked Dimiceli about his testimony that each patient had a specific amount for permissible use, and without objection Dimiceli testified it was not based on the patient's individual medical need but the "permissible amount within the different counties throughout the State of California.  I'll expand a little further."  Defense counsel instead moved to another topic.  Later, however, Dimiceli testified without objection that in his training he had "been told what is allowable in this county and what's allowable in the state."

On redirect, Dimiceli repeated over objection his opinion that personal users would not buy such large amounts of marijuana, and without objection testified such users are usually very forthcoming in law enforcement interactions.

*Defendant's testimony*

Defendant testified he had a physician's recommendation to use marijuana dated March 24, 2011, i.e., before the traffic stop, introduced as an exhibit at trial.  He had been planning to bake brownies at the house of a patient (he thought was named Edwin) using the three pounds of marijuana found in the trunk.  He had verified that person's identification and prescription but he did not keep such records.  He had received the $9,700 from Bhang Chocolate, which makes medical cannabis bars like the one found in the trunk.  He did marketing, promotion, and consulting for that company, and identified a check for $9,100 dated July 19, 2011, for "Oil inspection fee" which referred to his

5

inspection of concentrated cannabis oil. He withdrew $9,000 the day before the traffic stop, intending to gamble with it after the brownies were baked to celebrate his new job with Bhang. He also deposited a check for $13,620 that same date, also from Bhang, for oil inspection as well as marketing and promotion." He had worked 20 or 23 hours and made $23,000 in one week. He has no background in chemistry or food safety. He collects oil from patients and takes it to a laboratory for testing. He would verify patients by having them email him a picture of their identification and prescription, and then he would call the doctor, then arrange to meet the patient at a dispensary or other location.

Defendant denied making any profit. He claimed to be a member of "almost every collective in California" although he had no business license and had no proof--such as business records or list of patients--of his nonprofit status. He was in business with Castleman. Other than "Patient Lucas" and Scott at Bhang, defendant could not remember the name of anyone he had done business with. He claimed he had memory problems.

*Defense expert testimony*

Ryan Landers testified as a defense expert on the personal use and preparation of marijuana for personal use, based on his many years of using medical marijuana, and his knowledge based on consulting with thousands of qualified patients over the years about their usage of marijuana. Marijuana brownies are usually made by first grinding the marijuana buds and sautéing the resulting product in butter for 12 to 48 hours, and then using that butter for the brownie recipe. Because of the effort involved, one usually makes a lot of butter at one time. A typical ratio is a pound of marijuana to four pounds of butter. Three qualified patients making a batch using three pounds of marijuana would be making them for personal use, as the butter or brownies could be stored for later use. The marijuana taken from the BMW was not of high quality, and at the time of the stop would have been worth at most a few hundred dollars a pound. To process the marijuana with butter, the seeds and stems would have to be removed; there was a lot of stem in the

6

seized marijuana. Each patient's needs, insofar as quantity was concerned, was between the patient and physician, there was no blanket amount of usage.

*Arguments*

The prosecutor argued defendant's caginess in concealing what was in the box and false statement that there was no marijuana in it showed his consciousness of guilt. Three pounds of marijuana showed much more than personal use, and the large amounts of cash, price list, text messages referring to prices, and defendant's lack of ability to document or remember his transactions showed he was a drug dealer, not a medical marijuana collective member.

Defendant's counsel argued the money found with defendant came from working for Bhang, and was not relevant to whether he possessed marijuana for sale. Further, the text messages corroborated the claim that defendant delivered marijuana for medical purposes, because there was no proof he was making a profit. Officer Dimiceli was biased against the medical marijuana laws, and therefore his opinion should not be credited. Dimiceli's opinion about converting the three pounds of marijuana to joints did not account for the evidence that the marijuana was going to be converted into an edible form, as described by Landers.

The jury found defendant and Castleman guilty as charged, after deliberating for little more than an hour.

## DISCUSSION

### I

*Medical Marijuana Expert*

Defendant contends the People's expert testimony should have been excluded, for various reasons. However, as we shall explain, defendant forfeited most of his claims in the trial court. Moreover, given the abundant evidence of guilt and lack of a plausible medical marijuana defense, any error was harmless.

Defendant unsuccessfully moved for a hearing on expert qualifications.[2]  Instead, Officer Dimiceli testified as described, *ante*.

On appeal, defendant refers to three parts of Dimiceli's testimony, as follows:

1)  The testimony to which an objection was sustained, regarding the "very specific" requirements of the CUA.

2)  The testimony about the training that taught Officer Dimiceli that "the law is very specific when it comes to the [CUA].  In order to do my job within the legal parameters--" and, after an objection was overruled, "there are very specific amounts that an individual can be in possession of in order to be under compliance, or in order to possess marijuana legally under [the CUA]."

3)  The testimony that "It's too much.  Everything is too much.  Too much marijuana.  . . . too much money" to reflect personal use.

On appeal, defendant contends these answers reflect improper legal opinions, improper testimony about the ultimate issue in the case, and improper testimony about Dimiceli's personal belief in defendant's guilt.

At trial, defendant did not object based on personal opinion or ultimate issue, therefore these two claims are forfeited.  Objections must be timely and specific.  (Evid.

---

[2]  In part defendant emphasized that Officer Dimiceli had testified at the preliminary hearing that he had had no training on the legal use of marijuana, and there was no legal use of marijuana.  This fine distinction is correct.  "California cannot make 'legal' that which Congress makes illegal."  (*County of Butte v. Superior Court* (2009) 175 Cal.App.4th 729, 742 (dis. opn. of Morrison, J.).)  Instead, the CUA (§ 11362.5) and Medical Marijuana Program (MMP, § 11362.7, et seq.) create a limited defense and qualified immunity in certain prosecutions based on the purported medical use of marijuana.  (See *Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 981-982.)  Defendant's counsel used Dimiceli's testimony in this regard to argue he was hostile to medical marijuana.  The trial court instructed the jury that it could consider a witness's attitude about the case and bias or prejudice in evaluating that witness's testimony.

Code, § 353, subd. (a); *People v. Partida* (2005) 37 Cal.4th 428, 433-435.) For the same reason, the alternative claim of a due process violation is also forfeited.

Regarding his improper legal opinions claim, defendant contends the law should be delivered to the jury only through the instructions, and that the officer's repeated reference to specific amounts or limits regarding medical marijuana are wrong as a matter of law. We agree the law is communicated though the trial court's instructions, but the record regarding the officer's testimony is not as clear as defendant asserts on appeal.

As for the first item of testimony, a foundation objection--that the expert was not qualified to testify about the law--was *sustained*. The trial court instructed the jury to ignore questions to which objections were sustained. We see no reason why the jury would not have understood this instruction and disregarded the question to which an objection was sustained. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

As for the second item of testimony, the prosecutor tied the question to Officer Dimiceli's training on the CUA, and in the middle of the answer, the objection was "Foundation and nonresponsive." This seems to have been a claim that the expert *lacked expertise* to answer the question, not that the officer was improperly being asked to give a legal opinion. As the trial court pointed out in considering arguments on admission of the defense expert's testimony, it did not "let the officer testify with regard to his interpretation of the law."

As for the third item of testimony, that there was "too much" of everything, no objection was interposed. The failure to interpose an objection forfeits the claim on appeal. Moreover, assuming for purposes of argument only that an objection would have been futile, in context Officer Dimiceli was reiterating his opinion that three pounds of marijuana exceeded a normal user's needs, because of the normal daily intake of marijuana, and the fact that users buy smaller amounts. This opinion testimony did not purport to interpret the *law*, and was perfectly permissible. (See *People v. Dowl* (2013) 57 Cal.4th 1079, 1089-1090 ["the jury heard not only [the officer's] opinion regarding

defendant's intent, but also the officer's testimony regarding the various circumstances that, in his experience, were consistent with [intent to sell marijuana]"].)

In any event, assuming defendant's foundation objections, in the context in which they were lodged, could be construed to encompass an objection that Officer Dimiceli was materially misstating the law by testifying "specific" amounts were legal, we fail to see how any prejudice resulted, for three reasons.

First, Dimiceli did not testify about any *particular* amounts that would be appropriate, only that the amount in this case was far too much for personal use because of the average user's consumption and the tendency of marijuana to decay.

Second, the defense expert testified the amount each patient needed was a matter between the patient and physician, and there was no set permissible quantity. Thus, at worst, the jury was presented with a disagreement between experts--a disagreement that was resolved by the trial court's instructions regarding medical marijuana laws.

Third, and most importantly, the trial court instructed the jurors to follow the law stated in the court's instructions, which included instructions on the CUA and MMP, and those instructions did not specify any limits on the amount of marijuana a person could possess under those laws. Instead, they stated the amount must "be reasonably related to the patient's current medical needs." We presume the jury followed this instruction over Dimiceli's contrary view, to the extent they differed. (Cf. *People v. Boyette* (2002) 29 Cal.4th 381, 436 [even if prosecutor misstated the law, "the trial court properly instructed the jury on the law, and we presume the jury followed those instructions"].)

Thus, all defendant has shown, at best, is that the People's expert was mistaken about whether the law set specific amounts a patient could possess and possibly that he was biased against medical marijuana laws, as defense counsel argued to the jury. But it did not undermine his testimony, based on his training and experience, to the effect that the amount of marijuana found in the car was too much to reflect personal use, a point contested by the defense evidence concerning using that amount for cooking, rather than

10

smoking. The jury was properly focused by the trial court's instructions, and resolved the factual issue of defendant's intent to unlawfully transport and sell, as opposed to use or supply on a non-profit basis to qualified patients, the three pounds of marijuana in the trunk of the car.

To the extent defendant impliedly argues Dimiceli's testimony lacked any value because he did not understand the marijuana laws and therefore could not distinguish between non-criminal and criminal possession of marijuana under California law (See, e.g., *People v. Chakos* (2007) 158 Cal.App.4th 357), we are not persuaded. As described above, Dimiceli detailed his experience comparing marijuana users to sellers, and outlined the circumstances of this case that indicated intent to sell--defendant's lack of forthrightness, the large amount of marijuana possessed, the text messages, and the cash. Although defendant argues that the cell phones and money found in defendant's possession had little value to prove his guilt, the persuasiveness of the evidence was for the jury to decide. It may well have concluded that the huge amount of cash and the many text messages strongly bolstered the People's case that defendant was a common drug dealer, disguising his actions as that of a member of a non-profit collective, who earned about $1,000 per hour for testing cannabis oil--despite no chemical or food quality experience--while in near-constant communication with dozens of medical users about different strains and prices.

In short, in this case we are confident the jury was not improperly swayed by Officer Dimiceli's passing reference to specific amounts.

## II

### *Fines and Fees*

Defendant contends the trial court failed to orally impose fines and fees at the sentencing hearing and therefore they must be stricken. We agree.

11

The probation report recommended fees and fines, specifying statutes authorizing or requiring such amounts, including a laboratory fee ($100; see § 11372.5, subd. (a)[3]), a restitution fine ($800, see Pen. Code, § 1202.4), a stayed "additional restitution fine in the same amount" (see Pen. Code, § 1202.44), a drug program fee ($300, plus penalties and assessments prescribed by law, see § 11372.7), a jail booking fee ($340.01, see Gov. Code, § 29550.2), a court operations assessment ($80, see Pen. Code, § 1465.8, subd. (a)(1)) and a court facility fee ($60, see Gov. Code, § 70373).

The latter two were (correctly) *not* included as terms and conditions of probation in the report's recommendation, but instead were set forth separately. The report also separately recommended: "Cost of investigation and presentence report $702.00[,] monthly cost of probation $46.00, cost of urinalysis testing $25.00 per test." These costs were also (properly) excluded from the terms and conditions of probation and recommended to be imposed as separate court orders. The remaining fines and fees were included in the report as apparent terms and conditions of probation, although some were set forth under the separate heading "Fees and Fines" immediately following the general conditions of probation.

At sentencing, when invited to comment on the recommendations in the probation report, defendant's counsel made comments, but not about any fines or fees. The trial court agreed to modify the probation conditions in accordance with defense counsel's points, and then stated it would follow the recommendation in the probation report of one year in county jail. The trial court then formally suspended imposition of sentence, subject to a jail term and defendant's compliance with all probation terms and conditions, as modified based on the defense objections, and defendant accepted probation on those terms. The court ordered defendant to comply with "all terms and conditions of

---

[3] Although the Attorney General concedes that this fee and authorizing statute are not in the probation report, they are, at page 12. We therefore reject the concession.

probation as reflected in the probation report," although it did not separately recite the terms. It did not make any additional orders.

The order granting probation reflects all the fines, fees, and costs set forth in the probation report, including those recommended as separate orders. As to the laboratory fee, the drug program fee, the court operations fee, the costs of the presentence report, and the monthly costs of probation, the probation order indicates their imposition as "a court ordered fee not a condition of probation."

We agree with the Attorney General that the probation officer's detailed recommendations placed defendant, represented by counsel, on notice as to the relevant fees and fines. (See *People v. Trujillo* (2015) 60 Cal.4th 850, 858-859 [claim of failure of ability to pay deemed forfeited].) But because the trial court never *imposed* any fees or fines outside of those incorporated by reference in its oral order that defendant comply with the terms and conditions of probation, there was no reason for defendant to interpose any objection thereto, therefore he has not forfeited his claim on appeal.

Defendant relies in part on *People v. Mesa* (1975) 14 Cal.3d 466, which applies the general rule that the trial court must orally pronounce sentence--there, on two prior convictions that were admitted and reflected by the abstract, but were not mentioned at sentencing. (*Id*. at pp. 470-472.) Here, the trial court stated it was going to follow the probation officer's recommendation as to the length of sentence, and defendant indicated he understood the terms and conditions of probation, and except for two terms of probation unrelated to fees or fines, he did not object thereto. By accepting probation on the terms proposed by the trial court, referencing the probation report, defendant agreed *those terms* could be imposed.

The same cannot be said of amounts that were not imposed as probation conditions. Those amounts should not have been included in the probation order. However, as to those fees mandated by statute, the error resulted in an unauthorized sentence subject to correction at any time. (See *People v. Smith* (2001) 24 Cal.4th 849,

13

851-854.) Therefore, although the trial court failed to orally impose them, we must modify the judgment (order of probation) to add them. However, because the order of probation already lists these mandatory fees, no clerical modification is needed as to those amounts.

The non-mandatory amounts which much be removed consist of the $300 drug program fee (see Health & Saf. Code, § 11372.7, subd. (b) [ability to pay finding required]), the $702.00 cost of the investigative report, the $46 monthly cost of probation, and the $25 per-test cost of drug testing. (See Pen. Code, § 1260.)

III

*Included Offense*

Defendant contends that he should not have been convicted of both possession for sale of marijuana and transportation of marijuana, because the former is necessarily included within the latter. Defendant concedes that this contention is foreclosed by Supreme Court precedent. We agree with the latter point.

"In California, a single act or course of conduct by a defendant can lead to convictions 'of *any number* of the offenses charged.' [Citations.] But a judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034.) Although defendant does not like the test, he acknowledges that we must apply the "elements test" to determine whether either of the offenses for which he stands convicted is included within the other. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1231.) "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." (*Id.* at p. 1227.)

Defendant concedes that under the elements test, possession of drugs is not included within transportation of drugs. (See *People v. Rogers* (1971) 5 Cal.3d 129, 133-134.)

14

Therefore, must we reject defendant's contention that he was improperly convicted of both possession for sale of marijuana and transportation of marijuana. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## DISPOSITION

The judgment is affirmed as modified and the cause is remanded with directions to the trial court to prepare a new probation order consistent herewith.


        DUARTE       , J.


We concur:


      MAURO     , Acting P. J.


      HOCH      , J.